

FILED
CLERK, U.S. DISTRICT COURT

APR 1 0 2017

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

1  Wayne Spindler
2  P.O. Box 16501
   Encino, CA. 91416-6501
3  (213) 381-1403—phone
4  (213) 381-5542-fax

5  *In propia persona*
6

7              **UNITED STATES DISTRICT COURT**
8              **CENTRAL DISTRICT OF CALIFORNIA**
9
10

| | |
|---|---|
| 11 **Wayne Spindler,** | **Case No.: 2:16-cv-05655-JLS-E** |
| 12 **Plaintiff,** | Complaint Filed: July 29. 2016 |
| 13 | **DEMAND FOR JURY TRIAL** |
| 14 **vs.** | {Honorable Josephine L. Staton} |
| 15 **City of Los Angeles; Matthew M.** | **PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12 (b)(6) AND MOTION TO STRIKE UNDER F.R.C.P. 12 (f).** |
| 16 **Johnson; Mitchell Englander;** | |
| 17 | |
| 18 **Marqueece Harris-Dawson; Charlie** | |
| 19 **Beck, Steve Soboroff** | Due Date: April 10, 2017 |
| 20 | Hon. Charles F. Eick |
| 21 **and Does 1 to 10,** | [filed concurrently with Plaintiff's Declaration;(proposed) Order; Plaintiff's Memorandum of Points and Authorities in Opposition; and Statement of Genuine Disputes.] |
| 22 **Defendants.** | |
| 23 | |

24
25
26
27                              - 1 -
28

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12 (b)(6) AND MOTION TO STRIKE UNDER F.R.C.P. 12 (f).**

## I.             DOCUMENTS SUBJECT TO JUDICIAL NOTICE

Pursuant to Rule 201 of the Federal Rules of Evidence, Plaintiff request that judicial notice of the following documents, attached hereto:

- **EXHIBIT A** is a public record and a reproduction of the Ralph M. Brown Act.

- **EXHIBIT B:** is a public record: the duly enacted and adopted *Rules of the Los Angeles Board of Police Commissioners* dated September 15, 2015 pursuant to the authority set forth in City Charter §242

- **EXHIBIT C:** is a Court record: Response first page of a Superior Court action, Case No: BS162858 *City of Los Angeles v. Michael Hunt*

- **EXHIBIT D:** is a public record an article of the Los Angeles Times dated June 12, 2014 by David Zahniser-Contact Reporter and available at www.latimes.com/local/cityhall describing attorney Stephen F. Rohde's (who is the author of Defendant's exhibit A in their judicial notice packet) successful litigation against the Defendant City of Los Angeles for issues relating to alleged violations of public meeting laws that are similar to this suit and that Defendants are aware of.

– 2 –

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12 (b)(6)AND MOTION TO STRIKE UNDER F.R.C.P. 12 (f).**

- **EXHIBIT E:** is a public record and appeal, case No. BS162097 appeal case No. B276413 entitled Office of the City Attorney v. Spindler whereby the Defendants' Attorneys **themselves are a party** to the case of a civil workplace violence restraining order allegedly brought on their behalf of their "employee" who they named as "Herman J. Wesson"

- **EXHIBIT F:** is a public record, Case No BS162097 entitled **Office of the City Attorney v. Spindler** order of May 19, 2016 granting Defendants' attorney a restraining order for a claimed employee of theirs, a "Herman J. Wesson."

- **EXHIBIT G:** A declaration of "Herman J. Wesson, Jr." filed pursuant to case No. BS162097 signed under penalty of perjury that among other things shows **he does not work for nor is he an employee of** the Office of the City Attorney.

- **EXHIBIT H:** L.A. Times article, a public record dated March 29, 2017 showing Defendants' Attorneys filed a criminal charge against the Plaintiff

- **EXHIBIT I:** An article, a public record available on news blog

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12 (b)(6)AND MOTION TO STRIKE UNDER F.R.C.P. 12 (f).**

L.A. CityWatch Los Angeles dated April 3, 2017 showing incidents involving Plaintiff and the Defendant City of Los Angeles and Defendants' Attorney.

- **EXHIBIT J:** Public record as of April 2017 of Case No. 7VW01632 of the Defendants' Attorney filing a criminal charge and setting a hearing date on that charge for April 21, 2017.

- **EXHIBIT K:** Is a public record entitled *Marina Borawick v. City of Los Angeles* 2:17-cv-02036-BRO-JC (Cent. Dist. CA. filed filed March 14, 2017) alleging civil rights damages against Defendant City.

## II.        JUDICIAL NOTICE IS PROPER

Rule 201 of the Federal Rules of Evidence permits judicial notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned."

Exhibits A to K are proper subjects of judicial notice because a court may properly take judicial notice of "court filings and other matters of public record." Federal Rules of Evidence 201(b); *Reyn's Pasta Bella, LLC v. Vista USA, Inc.*

- 4 -

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12 (b)(6)AND MOTION TO STRIKE UNDER F.R.C.P. 12 (f).**

442 F.3d 741 (9th Cir. 2006.)

All records for which the Plaintiff requests judicial notice have a direct relation to matters at issue in this case, insofar as Plaintiff's allegations of violations and as applied violations to Rules of Decorum at public meetings and repeated violations of First Amendment and open meeting violations ongoing since last being noticed and litigated, and thus shifting the burden of proof to the Defendants in their continuous policy of civil rights violations enlisted by Plaintiff such as per *Monell* claims.

Defendants cite these rules of Decorum and reference the litigation of Michael Hunt and Stephen Rohde such that its authenticity by Defendants is not questioned *Branch v. Tunnell* 14 F.3d 449 (9th Cir. 1994.) ("[A] document 'outside' the complaint if the complaint specifically refers to the document and if its authenticity is not questioned.")

Further, the Defendants without question have admitted to the prior litigation that alleged violations of civil rights such as this current suit that ultimately resulted in those Plaintiffs prevailing either via settlement or nominally with the attorney's fees awarded in those cases in the six figure level.

Defendants' Attorney is also a party to current litigation against the Plaintiff

- 5 -

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12 (b)(6)AND MOTION TO STRIKE UNDER F.R.C.P. 12 (f).**

over a restraining order involving a non-existent employee of the City Attorney that the City Attorney knows and knew full well never has nor works for **them.** Exhibit F. Exhibit G is the declaration of the so-called employee: The person referred to falsely as the City Attorney's employee is none other than the L.A. City Council President, Herman Jason Wesson, Jr., who under oath states clearly he is not employed by the City Attorney's office.

The Defendants' attorneys, the City Attorney of Los Angeles, garnered and received information from Plaintiff regarding Plaintiff's guns, one of these guns was a pre-banned AK-47 similar type gun. The Defendant City on May 20, 2016 could not locate in their computer a registration for this 1989 purchased weapon. The Plaintiff produced the receipt for the 1989 purchase of the gun. The filing of the sham Restraining Order and Plaintiff complying with the Judge's Order  May 20, 2016 was the basis for the information to file the criminal complaint on March 29, 2017, because the T.R.O. gained by Defendants' Attorney forced the Plaintiff under threat of arrest to turn in all guns in his possession within 24 hours of being served with the T.R.O. and hearing date on it.[1]

---

[1] Since this happened, Plaintiff has been ill and forced to work on this answer while under the duress of this criminal charge and threat to him. It is believed the charge was filed to either have Plaintiff drop this suit or fail by illness

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12 (b)(6)AND MOTION TO STRIKE UNDER F.R.C.P. 12 (f).**

# III.  **CONCLUSION**

For the reasons stated above, Plaintiff respectfully requests that the Court take Judicial notice of each of the above listed documents and transcripts.

Dated this 7th  Day of April 2017

Wayne Spindler
*In propia persona*

or pressure to not file an answer here in this matter. *See* CAL. Ethics Rule 5-100.

- 7 -

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER F.R.C.P. 12 (b)(6)AND MOTION TO STRIKE UNDER F.R.C.P. 12 (f).**

# EXHIBIT A

8

# APPENDIX B

## THE RALPH M. BROWN ACT

### CONTENTS

§ 54950.      Policy declaration
§ 54950.5.    Title
§ 54951.      Definition of local agency
§ 54952.      Definition of legislative body
§ 54952.1.    Definition of member of a legislative body
§ 54952.2.    Definition of meeting
§ 54952.6.    Definition of action taken
§ 54952.7.    Copies of Act; Distribution
§ 54953.      Open meetings required; Teleconferencing; Secret ballots
§ 54953.1.    Grand jury testimony by members
§ 54953.3.    Conditions to attendance at meetings
§ 54953.2.    Meeting; Disability rights
§ 54953.5.    Recording meetings
§ 54953.6.    Broadcasting meetings
§ 54953.7.    Greater access to meetings permitted
§ 54954.      Notice of regular meetings; Boundary restrictions for all meetings
§ 54954.1.    Agenda information provided by mail; Fee
§ 54954.2.    Agenda requirements; Regular meetings
§ 54954.3.    Public's right to testify at meetings
§ 54954.4.    Reimbursement of costs
§ 54954.5.    Safe harbor agenda for closed sessions
§ 54954.6.    New taxes and/or assessments; Procedural requirements
§ 54955.      Adjournment
§ 54955.1.    Continuance
§ 54956.      Special meetings
§ 54956.5.    Emergency meetings
§ 54956.6.    Fees
§ 54956.7.    Closed session; License application of rehabilitated criminal
§ 54956.8.    Closed session; Real Property negotiations
§ 54956.86.   Closed session; Health claims
§ 54956.87.   Record exempt; Closed session; County health plan
§ 54956.9.    Closed session; Pending litigation
§ 54956.95.   Closed session; Insurance liability
§ 54957.      Closed session; Personnel and threat to public security
§ 54957.1.    Report at conclusion of closed session
§ 54957.2.    Minutes of closed session
§ 54957.5.    Agendas and other materials; Public records

exHiBit A

9

| § 54957.6. | Closed session; Labor negotiations |
| § 54957.7. | Announcement prior to closed sessions |
| § 54957.8. | Closed session; Multijurisdictional drug enforcement agency |
| § 54957.9. | Disruption of meeting |
| § 54957.10. | Closed session; Deferred Compensation Plan; Early withdrawal |
| § 54958. | Act supercedes conflicting laws |
| § 54959. | Violation of Act; Criminal penalty |
| § 54960. | Violation of Act; Civil remedies |
| § 54960.1. | Violation of Act; Actions declared null and void |
| § 54960.5. | Costs and attorney fees |
| § 54961. | Discrimination; Disabled access; Fees for attendance; Disclosure of victims |
| § 54962. | Closed session; Express authorization required |
| § 54963. | Closed session; Disclosure of confidential information |

# THE RALPH M. BROWN ACT

**54950.        Policy declaration**

In enacting this chapter, the Legislature finds and declares that the public commissions, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business. It is the intent of the law that their actions be taken openly and that their deliberations be conducted openly.

The people of this State do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created.

**54950.5.        Title**

This chapter shall be known as the Ralph M. Brown Act.

**54951.        Definition of local agency**

As used in this chapter, "local agency" means a county, city, whether general law or chartered, city and county, town, school district, municipal corporation, district, political subdivision, or any board, commission or agency thereof, or other local public agency.

10

**54952.**   **Definition of legislative body**

As used in this chapter, "legislative body" means:

(a)   The governing body of a local agency or any other local body created by state or federal statute.

(b)   A commission, committee, board, or other body of a local agency, whether permanent or temporary, decisionmaking or advisory, created by charter, ordinance, resolution, or formal action of a legislative body.  However, advisory committees, composed solely of the members of the legislative body that are less than a quorum of the legislative body are not legislative bodies, except that standing committees of a legislative body, irrespective of their composition, which have a continuing subject matter jurisdiction, or a meeting schedule fixed by charter, ordinance, resolution, or formal action of a legislative body are legislative bodies for purposes of this chapter.

(c)   (1)   A board, commission, committee, or other multimember body that governs a private corporation, limited liability company, or other entity that either:

(A)   Is created by the elected legislative body in order to exercise authority that may lawfully be delegated by the elected governing body to a private corporation, limited liability company, or other entity.

(B)   Receives funds from a local agency and the membership of whose governing body includes a member of the legislative body of the local agency appointed to that governing body as a full voting member by the legislative body of the local agency.

(2)   Notwithstanding subparagraph (B) of paragraph (1), no board, commission, committee, or other multimember body that governs a private corporation, limited liability company, or other entity that receives funds from a local agency and, as of February 9, 1996, has a member of the legislative body of the local agency as a full voting member of the governing body of that private corporation, limited liability company, or other entity shall be relieved from the public meeting requirements of this chapter by virtue of a change in status of the full voting member to a nonvoting member.

(d)   The lessee of any hospital the whole or part of which is first leased pursuant to subdivision (p) of Section 32121 of the Health and Safety Code after January 1, 1994, where the lessee exercises any material authority of a legislative body of a local agency delegated to it by that legislative body whether the lessee is organized and operated by the local agency or by a delegated authority.

## 54952.1.   Definition of member of a legislative body

Any person elected to serve as a member of a legislative body who has not yet assumed the duties of office shall conform his or her conduct to the requirements of this chapter and shall be treated for purposes of enforcement of this chapter as if he or she has already assumed office.

## 54952.2.   Definition of meeting

(a)   As used in this chapter, "meeting" includes any congregation of a majority of the members of a legislative body at the same time and place to hear, discuss, or deliberate upon any item that is within the subject matter jurisdiction of the legislative body or the local agency to which it pertains.

(b)   Except as authorized pursuant to Section 54953, any use of direct communication, personal intermediaries, or technological devices that is employed by a majority of the members of the legislative body to develop a collective concurrence as to action to be taken on an item by the members of the legislative body is prohibited.

(c)   Nothing in this section shall impose the requirements of this chapter upon any of the following:

(1)   Individual contacts or conversations between a member of a legislative body and any other person.

(2)   The attendance of a majority of the members of a legislative body at a conference or similar gathering open to the public that involves a discussion of issues of general interest to the public or to public agencies of the type represented by the legislative body, provided that a majority of the members do not discuss among themselves, other than as part of the scheduled program, business of a specified nature that is within the subject matter jurisdiction of the local agency. Nothing in this paragraph is intended to allow members of the public free admission to a conference or similar gathering at which the organizers have required other participants or registrants to pay fees or charges as a condition of attendance.

(3)   The attendance of a majority of the members of a legislative body at an open and publicized meeting organized to address a topic of local community concern by a person or organization other than the local agency, provided that a majority of the members do not discuss among themselves, other than as part of the scheduled program, business of a specific nature that is within the subject matter jurisdiction of the legislative body of the local agency.

(4)   The attendance of a majority of the members of a legislative body at an open and noticed meeting of another body of the local agency, or at an open and noticed meeting of a legislative body of another local agency, provided that a majority of the members do not discuss among

12

themselves, other than as part of the scheduled meeting, business of a specific nature that is within the subject matter jurisdiction of the legislative body of the local agency.

(5)     The attendance of a majority of the members of a legislative body at a purely social or ceremonial occasion, provided that a majority of the members do not discuss among themselves business of a specific nature that is within the subject matter jurisdiction of the legislative body of the local agency.

(6)     The attendance of a majority of the members of a legislative body at an open and noticed meeting of a standing committee of that body, provided that the members of the legislative body who are not members of the standing committee attend only as observers.

## 54952.6.   Definition of action taken

As used in this chapter, "action taken" means a collective decision made by a majority of the members of a legislative body, a collective commitment or promise by a majority of the members of a legislative body to make a positive or a negative decision, or an actual vote by a majority of the members of a legislative body when sitting as a body or entity, upon a motion, proposal, resolution, order or ordinance.

## 54952.7.   Copies of Act; Distribution

A legislative body of a local agency may require that a copy of this chapter be given to each member of the legislative body and any person elected to serve as a member of the legislative body who has not assumed the duties of office. An elected legislative body of a local agency may require that a copy of this chapter be given to each member of each legislative body all or a majority of whose members are appointed by or under the authority of the elected legislative body.

## 54953.   Open meetings required; Teleconferencing; Secret ballots

(a)     All meetings of the legislative body of a local agency shall be open and public, and all persons shall be permitted to attend any meeting of the legislative body of a local agency, except as otherwise provided in this chapter.

(b)     (1)     Notwithstanding any other provision of law, the legislative body of a local agency may use teleconferencing for the benefit of the public and the legislative body of a local agency in connection with any meeting or proceeding authorized by law. The teleconferenced meeting or proceeding shall comply with all requirements of this chapter and all otherwise applicable provisions of law relating to a specific type of meeting or proceeding.

(2)     Teleconferencing, as authorized by this section, may be used for all purposes in connection with any meeting within the subject matter jurisdiction of the legislative body. All votes taken during a teleconferenced meeting shall be by rollcall.

13

(3)    If the legislative body of a local agency elects to use teleconferencing, it shall post agendas at all teleconference locations and conduct teleconference meetings in a manner that protects the statutory and constitutional rights of the parties or the public appearing before the legislative body of a local agency. Each teleconference location shall be identified in the notice and agenda of the meeting or proceeding, and each teleconference location shall be accessible to the public. During the teleconference, at least a quorum of the members of the legislative body shall participate from locations within the boundaries of the territory over which the local agency exercises jurisdiction. The agenda shall provide an opportunity for members of the public to address the legislative body directly pursuant to Section 54954.3 at each teleconference location.

(4)    For the purposes of this section, "teleconference" means a meeting of a legislative body, the members of which are in different locations, connected by electronic means, through either audio or video, or both. Nothing in this section shall prohibit a local agency from providing the public with additional teleconference locations.

(c)    No legislative body shall take action by secret ballot, whether preliminary or final.

## 54953.2.    Meeting; Disability rights

All meetings of a legislative body of a local agency that are open and public shall meet the protections and prohibitions contained in Section 202 of the Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof.

## 54953.1.    Grand jury testimony by members

The provisions of this chapter shall not be construed to prohibit the members of the legislative body of a local agency from giving testimony in private before a grand jury, either as individuals or as a body.

## 54953.3.    Conditions to attendance at meetings

A member of the public shall not be required, as a condition to attendance at a meeting of a legislative body of a local agency, to register his or her name, to provide other information, to complete a questionnaire, or otherwise to fulfill any condition precedent to his or her attendance.

If an attendance list, register, questionnaire, or other similar document is posted at or near the entrance to the room where the meeting is to be held, or is circulated to the persons present during the meeting, it shall state clearly that the signing, registering, or completion of the document is voluntary, and that all persons may attend the meeting regardless of whether a person signs, registers, or completes the document.

14

**54953.5.**      **Recording meetings**

(a)      Any person attending an open and public meeting of a legislative body of a local agency shall have the right to record the proceedings with an audio or video tape recorder or a still or motion picture camera in the absence of a reasonable finding by the legislative body of the local agency that the recording cannot continue without noise, illumination, or obstruction of view that constitutes, or would constitute, a persistent disruption of the proceedings.

(b)      Any tape or film record of an open and public meeting made for whatever purpose by or at the direction of the local agency shall be subject to inspection pursuant to the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1), but, notwithstanding Section 34090, may be erased or destroyed 30 days after the taping or recording. Any inspection of a video or tape recording shall be provided without charge on a video or tape player made available by the local agency.

**54953.6.**      **Broadcasting meetings**

No legislative body of a local agency shall prohibit or otherwise restrict the broadcast of its open and public meetings in the absence of a reasonable finding that the broadcast cannot be accomplished without noise, illumination, or obstruction of view that would constitute a persistent disruption of the proceedings.

**54953.7.**      **Greater access to meetings permitted**

Notwithstanding any other provision of law, legislative bodies of local agencies may impose requirements upon themselves which allow greater access to their meetings than prescribed by the minimal standards set forth in this chapter. In addition thereto, an elected legislative body of a local agency may impose such requirements on those appointed legislative bodies of the local agency of which all or a majority of the members are appointed by or under the authority of the elected legislative body.

**54954.**      **Notice of regular meetings; Boundary restrictions for all meetings**

(a)      Each legislative body of a local agency, except for advisory committees or standing committees, shall provide, by ordinance, resolution, bylaws, or by whatever other rule is required for the conduct of business by that body, the time and place for holding regular meetings. Meetings of advisory committees or standing committees, for which an agenda is posted at least 72 hours in advance of the meeting pursuant to subdivision (a) of Section 54954.2, shall be considered for purposes of this chapter as regular meetings of the legislative body.

(b)      Regular and special meetings of the legislative body shall be held within the boundaries of the territory over which the local agency exercises jurisdiction, except to do any of the following:

15

(1)     Comply with state or federal law or court order, or attend a judicial or administrative proceeding to which the local agency is a party.

(2)     Inspect real or personal property which cannot be conveniently brought within the boundaries of the territory over which the local agency exercises jurisdiction provided that the topic of the meeting is limited to items directly related to the real or personal property.

(3)     Participate in meetings or discussions of multiagency significance that are outside the boundaries of a local agency's jurisdiction. However, any meeting or discussion held pursuant to this subdivision shall take place within the jurisdiction of one of the participating local agencies and be noticed by all participating agencies as provided for in this chapter.

(4)     Meet in the closest meeting facility if the local agency has no meeting facility within the boundaries of the territory over which the local agency exercises jurisdiction, or at the principal office of the local agency if that office is located outside the territory over which the agency exercises jurisdiction.

(5)     Meet outside their immediate jurisdiction with elected or appointed officials of the United States or the State of California when a local meeting would be impractical, solely to discuss a legislative or regulatory issue affecting the local agency and over which the federal or state officials have jurisdiction.

(6)     Meet outside their immediate jurisdiction if the meeting takes place in or nearby a facility owned by the agency, provided that the topic of the meeting is limited to items directly related to the facility.

(7)     Visit the office of the local agency's legal counsel for a closed session on pending litigation held pursuant to Section 54956.9, when to do so would reduce legal fees or costs.

(c)     Meetings of the governing board of a school district shall be held within the district except under the circumstances enumerated in subdivision (b), or to do any of the following:

(1)     Attend a conference on nonadversarial collective bargaining techniques.

(2)     Interview members of the public residing in another district with reference to the trustees' potential employment of the superintendent of that district.

(3)     Interview a potential employee from another district.

(d)     Meetings of a joint powers authority shall occur within the territory of at least one of its member agencies, or as provided in subdivision (b). However, a joint powers authority which has members throughout the state may meet at any facility in the state which complies with the requirements of Section 54961.

57

(e)     If, by reason of fire, flood, earthquake, or other emergency, it shall be unsafe to meet in the place designated, the meetings shall be held for the duration of the emergency at the place designated by the presiding officer of the legislative body or his or her designee in a notice to the local media that have requested notice pursuant to Section 54956, by the most rapid means of communication available at the time.

## 54954.1.     Agenda information provided by mail; Fee

Any person may request that a copy of the agenda, or a copy of all the documents constituting the agenda packet, of any meeting of a legislative body be mailed to that person. If requested, the agenda and documents in the agenda packet shall be made available in appropriate alternative formats to persons with a disability, as required by Section 202 of the Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof. Upon receipt of the written request, the legislative body or its designee shall cause the requested materials to be mailed at the time the agenda is posted pursuant to Section 54954.2 and 54956 or upon distribution to all, or a majority of all, of the members of a legislative body, whichever occurs first. Any request for mailed copies of agendas or agenda packets shall be valid for the calendar year in which it is filed, and must be renewed following January 1 of each year. The legislative body may establish a fee for mailing the agenda or agenda packet, which fee shall not exceed the cost of providing the service. Failure of the requesting person to receive the agenda or agenda packet pursuant to this section shall not constitute grounds for invalidation of the actions of the legislative body taken at the meeting for which the agenda or agenda packet was not received.

## 54954.2.     Agenda requirements; Regular meetings

(a)     At least 72 hours before a regular meeting, the legislative body of the local agency, or its designee, shall post an agenda containing a brief general description of each item of business to be transacted or discussed at the meeting, including items to be discussed in closed session. A brief general description of an item generally need not exceed 20 words. The agenda shall specify the time and location of the regular meeting and shall be posted in a location that is freely accessible to members of the public. If requested, the agenda shall be made available in appropriate alternative formats to persons with a disability, as required by Section 202 of the Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof. The agenda shall include information regarding how, to whom, and when a request for disability-related modification or accommodation, including auxiliary aids or services may be made by a person with a disability who requires a modification or accommodation in order to participate in the public meeting.

No action or discussion shall be undertaken on any item not appearing on the posted agenda, except that members of a legislative body or its staff may briefly respond to statements made or questions posed by persons exercising their public testimony rights under Section 54954.3. In addition, on their own initiative or in response to questions posed by the public, a member of a legislative body or its staff may ask a question for clarification, make a brief announcement, or make a brief report on

17

his or her own activities. Furthermore, a member of a legislative body, or the body itself, subject to rules or procedures of the legislative body, may provide a reference to staff or other resources for factual information, request staff to report back to the body at a subsequent meeting concerning any matter, or take action to direct staff to place a matter of business on a future agenda.

(b)      Notwithstanding subdivision (a), the legislative body may take action on items of business not appearing on the posted agenda under any of the conditions stated below. Prior to discussing any item pursuant to this subdivision, the legislative body shall publicly identify the item.

(1)      Upon a determination by a majority vote of the legislative body that an emergency situation exists, as defined in Section 54956.5.

(2)      Upon a determination by a two-thirds vote of the members of the legislative body present at the meeting, or, if less than two-thirds of the members are present, a unanimous vote of those members present, that there is a need to take immediate action and that the need for action came to the attention of the local agency subsequent to the agenda being posted as specified in subdivision (a).

(3)      The item was posted pursuant to subdivision (a) for a prior meeting of the legislative body occurring not more than five calendar days prior to the date action is taken on the item, and at the prior meeting the item was continued to the meeting at which action is being taken.

54954.3.      **Public's right to testify at meetings**

(a)      Every agenda for regular meetings shall provide an opportunity for members of the public to directly address the legislative body on any item of interest to the public, before or during the legislative body's consideration of the item, that is within the subject matter jurisdiction of the legislative body, provided that no action shall be taken on any item not appearing on the agenda unless the action is otherwise authorized by subdivision (b) of Section 54954.2.  However, the agenda need not provide an opportunity for members of the public to address the legislative body on any item that has already been considered by a committee, composed exclusively of members of the legislative body, at a public meeting wherein all interested members of the public were afforded the opportunity to address the committee on the item, before or during the committee's consideration of the item, unless the item has been substantially changed since the committee heard the item, as determined by the legislative body. Every notice for a special meeting shall provide an opportunity for members of the public to directly address the legislative body concerning any item that has been described in the notice for the meeting before or during consideration of that item.

(b)      The legislative body of a local agency may adopt reasonable regulations to ensure that the intent of subdivision (a) is carried out, including, but not limited to, regulations limiting the total amount of time allocated for public testimony on particular issues and for each individual speaker.

*18*

(c)     The legislative body of a local agency shall not prohibit public criticism of the policies, procedures, programs, or services of the agency, or of the acts or omissions of the legislative body. Nothing in this subdivision shall confer any privilege or protection for expression beyond that otherwise provided by law.

**54954.4.        Reimbursement of costs**

(a)     The Legislature hereby finds and declares that Section 12 of Chapter 641 of the Statutes of 1986, authorizing reimbursement to local agencies and school districts for costs mandated by the state pursuant to that act, shall be interpreted strictly.  The intent of the Legislature is to provide reimbursement for only those costs which are clearly and unequivocally incurred as the direct and necessary result of compliance with Chapter 641 of the Statutes of 1986.

(b)     In this regard, the Legislature directs all state employees and officials involved in reviewing or authorizing claims for reimbursement, or otherwise participating in the reimbursement process, to rigorously review each claim and authorize only those claims, or parts thereof, which represent costs which are clearly and unequivocally incurred as the direct and necessary result of compliance with Chapter 641 of the Statutes of 1986 and for which complete documentation exists. For purposes of Section 54954.2, costs eligible for reimbursement shall only include the actual cost to post a single agenda for any one meeting.

(c)     The Legislature hereby finds and declares that complete, faithful, and uninterrupted compliance with the Ralph M. Brown Act (Chapter 9 (commencing with Section 54950) of Part 1 of Division 2 of Title 5 of the Government Code) is a matter of overriding public importance.  Unless specifically stated, no future Budget Act, or related budget enactments, shall, in any manner, be interpreted to suspend, eliminate, or otherwise modify the legal obligation and duty of local agencies to fully comply with Chapter 641 of the Statutes of 1986 in a complete, faithful, and uninterrupted manner.

**54954.5.        Safe harbor agenda for closed sessions**

For purposes of describing closed session items pursuant to Section 54954.2, the agenda may describe closed sessions as provided below. No legislative body or elected official shall be in violation of Section 54954.2 or 54956 if the closed session items were described in substantial compliance with this section. Substantial compliance is satisfied by including the information provided below, irrespective of its format.

(a)     With respect to a closed session held pursuant to Section 54956.7:

LICENSE/PERMIT DETERMINATION

Applicant(s): (Specify number of applicants)

(b)     With respect to every item of business to be discussed in closed session pursuant to Section 54956.8:

CONFERENCE WITH REAL PROPERTY NEGOTIATORS

Property: (Specify street address, or if no street address, the parcel number or other unique reference, of the real property under negotiation)

Agency negotiator: (Specify names of negotiators attending the closed session) (If circumstances necessitate the absence of a specified negotiator, an agent or designee may participate in place of the absent negotiator so long as the name of the agent or designee is announced at an open session held prior to the closed session.)

Negotiating parties: (Specify name of party (not agent))

Under negotiation: (Specify whether instruction to negotiator will concern price, terms of payment, or both)

(c)     With respect to every item of business to be discussed in closed session pursuant to Section 54956.9:

CONFERENCE WITH LEGAL COUNSEL--EXISTING LITIGATION (Subdivision (a) of Section 54956.9)

Name of case: (Specify by reference to claimant's name, names of parties, case or claim numbers)

or

Case name unspecified: (Specify whether disclosure would jeopardize service of process or existing settlement negotiations)

CONFERENCE WITH LEGAL COUNSEL--ANTICIPATED LITIGATION

Significant exposure to litigation pursuant to subdivision (b) of Section 54956.9: (Specify number of potential cases)

(In addition to the information noticed above, the agency may be required to provide additional information on the agenda or in an oral statement prior to the closed session pursuant to subparagraphs (B) to (E), inclusive, of paragraph (3) of subdivision (b) of Section 54956.9.)

61

20

Initiation of litigation pursuant to subdivision (c) of Section 54956.9: (Specify number of potential cases)

(d)     With respect to every item of business to be discussed in closed session pursuant to Section 54956.95:

LIABILITY CLAIMS

Claimant: (Specify name unless unspecified pursuant to Section 54961)

Agency claimed against: (Specify name)

(e)     With respect to every item of business to be discussed in closed session pursuant to Section 54957:

THREAT TO PUBLIC SERVICES OR FACILITIES

Consultation with: (Specify name of law enforcement agency and title of officer, or name of applicable agency representative and title)

PUBLIC EMPLOYEE APPOINTMENT

Title: (Specify description of position to be filled)

PUBLIC EMPLOYMENT

Title: (Specify description of position to be filled)

PUBLIC EMPLOYEE PERFORMANCE EVALUATION

Title: (Specify position title of employee being reviewed)

PUBLIC EMPLOYEE DISCIPLINE/DISMISSAL/RELEASE

(No additional information is required in connection with a closed session to consider discipline, dismissal, or release of a public employee. Discipline includes potential reduction of compensation.)

(f)     With respect to every item of business to be discussed in closed session pursuant to Section 54957.6:

21

CONFERENCE WITH LABOR NEGOTIATORS

      Agency designated representatives: (Specify names of designated representatives attending the closed session) (If circumstances necessitate the absence of a specified designated representative, an agent or designee may participate in place of the absent representative so long as the name of the agent or designee is announced at an open session held prior to the closed session.)

      Employee organization: (Specify name of organization representing employee or employees in question)

      or

      Unrepresented employee: (Specify position title of unrepresented employee who is the subject of the negotiations)

(g)     With respect to closed sessions called pursuant to Section 54957.8:

CASE REVIEW/PLANNING

      (No additional information is required in connection with a closed session to consider case review or planning.)

(h)     With respect to every item of business to be discussed in closed session pursuant to Sections 1461, 32106, and 32155 of the Health and Safety Code or Sections 37606 and 37624.3 of the Government Code:

REPORT INVOLVING TRADE SECRET

      Discussion will concern: (Specify whether discussion will concern proposed new service, program, or facility)

      Estimated date of public disclosure: (Specify month and year)

HEARINGS

      Subject matter: (Specify whether testimony/deliberation will concern staff privileges, report of medical audit committee, or report of quality assurance committee)

(i)     With respect to every item of business to be discussed in closed session pursuant to Section 54956.86:

63

22

CHARGE OR COMPLAINT INVOLVING INFORMATION PROTECTED BY FEDERAL LAW

(No additional information is required in connection with a closed session to discuss a charge or complaint pursuant to Section 54956.86.)

**54954.6.    New taxes and/or assessments; Procedural requirements**

(a)    (1)    Before adopting any new or increased general tax or any new or increased assessment, the legislative body of a local agency shall conduct at least one public meeting at which local officials shall allow public testimony regarding the proposed new or increased general tax or new or increased assessment in addition to the noticed public hearing at which the legislative body proposes to enact or increase the general tax or assessment.

For purposes of this section, the term "new or increased assessment" does not include any of the following:

(A)    A fee that does not exceed the reasonable cost of providing the services, facilities, or regulatory activity for which the fee is charged.

(B)    A service charge, rate, or charge, unless a special district's principal act requires the service charge, rate, or charge to conform to the requirements of this section.

(C)    An ongoing annual assessment if it is imposed at the same or lower amount as any previous year.

(D)    An assessment that does not exceed an assessment formula or range of assessments previously specified in the notice given to the public pursuant to subparagraph (G) of paragraph (2) of subdivision (c) and that was previously adopted by the agency or approved by the voters in the area where the assessment is imposed.

(E)    Standby or immediate availability charges.

(2)    The legislative body shall provide at least 45 days' public notice of the public hearing at which the legislative body proposes to enact or increase the general tax or assessment. The legislative body shall provide notice for the public meeting at the same time and in the same document as the notice for the public hearing, but the meeting shall occur prior to the hearing.

(b)    (1)    The joint notice of both the public meeting and the public hearing required by subdivision (a) with respect to a proposal for a new or increased general tax shall be accomplished by placing a display advertisement of at least one-eighth page in a newspaper of general circulation for three weeks pursuant to Section 6063 and by a first-class mailing to those interested parties who have filed a written request with the local agency for mailed notice of public meetings or hearings on new

23

or increased general taxes.  The public meeting pursuant to subdivision (a) shall take place no earlier than 10 days after the first publication of the joint notice pursuant to this subdivision.  The public hearing shall take place no earlier than seven days after the public meeting pursuant to this subdivision. Notwithstanding paragraph (2) of subdivision (a), the joint notice need not include notice of the public meeting after the meeting has taken place.  The public hearing pursuant to subdivision (a) shall take place no earlier than 45 days after the first publication of the joint notice pursuant to this subdivision. Any written request for mailed notices shall be effective for one year from the date on which it is filed unless a renewal request is filed.  Renewal requests for mailed notices shall be filed on or before April 1 of each year.  The legislative body may establish a reasonable annual charge for sending notices based on the estimated cost of providing the service.

(2)     The notice required by paragraph (1) of this subdivision shall include, but not be limited to, the following:

(A)     The amount or rate of the tax.  If the tax is proposed to be increased from any previous year, the joint notice shall separately state both the existing tax rate and the proposed tax rate increase.

(B)     The activity to be taxed.

(C)     The estimated amount of revenue to be raised by the tax annually.

(D)     The method and frequency for collecting the tax.

(E)     The dates, times, and locations of the public meeting and hearing described in subdivision (a).

(F)     The phone number and address of an individual, office, or organization that interested persons may contact to receive additional information about the tax.

(c)     (1)     The joint notice of both the public meeting and the public hearing required by subdivision (a) with respect to a proposal for a new or increased assessment on real property shall be accomplished through a mailing, postage prepaid, in the United States mail and shall be deemed given when so deposited.  The public meeting pursuant to subdivision (a) shall take place no earlier than 10 days after the joint mailing pursuant to this subdivision.  The public hearing shall take place no earlier than seven days after the public meeting pursuant to this subdivision.  The envelope or the cover of the mailing shall include the name of the local agency and the return address of the sender.  This mailed notice shall be in at least 10-point type and shall be given to all property owners proposed to be subject to the new or increased assessment by a mailing by name to those persons whose names and addresses appear on the last equalized county assessment roll or the State Board of Equalization assessment roll, as the case may be.

65

Q4

(2)      The joint notice required by paragraph (1) of this subdivision shall include, but not be limited to, the following:

(A)      The estimated amount of the assessment per parcel.  If the assessment is proposed to be increased from any previous year, the joint notice shall separately state both the amount of the existing assessment and the proposed assessment increase.

(B)      ' A general description of the purpose or improvements that the assessment will fund.

(C)      The address to which property owners may mail a protest against the assessment.

(D)      The phone number and address of an individual, office, or organization that interested persons may contact to receive additional information about the assessment.

(E)      A statement that a majority protest will cause the assessment to be abandoned if the assessment act used to levy the assessment so provides.  Notice shall also state the percentage of protests required to trigger an election, if applicable.

(F)      The dates, times, and locations of the public meeting and hearing described in subdivision (a).

(G)      A proposed assessment formula or range as described in subparagraph (D) of paragraph (1) of subdivision (a) if applicable and that is noticed pursuant to this section.

(3)      Notwithstanding paragraph (1), in the case of an assessment that is proposed exclusively for operation and maintenance expenses imposed throughout the entire local agency, or exclusively for operation and maintenance assessments proposed to be levied on 50,000 parcels or more, notice may be provided pursuant to this subdivision or pursuant to paragraph (1) of subdivision (b) and shall include the estimated amount of the assessment of various types, amounts, or uses of property and the information required by subparagraphs (B) to (G), inclusive, of paragraph (2) of subdivision (c).

(4)      Notwithstanding paragraph (1), in the case of an assessment proposed to be levied pursuant to Part 2 (commencing with Section 22500) of Division 2 of the Streets and Highways Code by a regional park district, regional park and open-space district, or regional open-space district formed pursuant to Article 3 (commencing with Section 5500) of Chapter 3 of Division 5 of, or pursuant to Division 26 (commencing with Section 35100) of, the Public Resources Code, notice may be provided pursuant to paragraph (1) of subdivision (b).

25

(d)     The notice requirements imposed by this section shall be construed as additional to, and not to supersede, existing provisions of law, and shall be applied concurrently with the existing provisions so as to not delay or prolong the governmental decisionmaking process.

(e)     This section shall not apply to any new or increased general tax or any new or increased assessment that requires an election of either of the following:

(1)     The property owners subject to the assessment.

(2)     The voters within the local agency imposing the tax or assessment.

(f)     Nothing in this section shall prohibit a local agency from holding a consolidated meeting or hearing at which the legislative body discusses multiple tax or assessment proposals.

(g)     The local agency may recover the reasonable costs of public meetings, public hearings, and notice required by this section from the proceeds of the tax or assessment. The costs recovered for these purposes, whether recovered pursuant to this subdivision or any other provision of law, shall not exceed the reasonable costs of the public meetings, public hearings, and notice.

(h)     Any new or increased assessment that is subject to the notice and hearing provisions of Article XIIIC or XIIID of the California Constitution is not subject to the notice and hearing requirements of this section.

**54955.     Adjournment**

The legislative body of a local agency may adjourn any regular, adjourned regular, special or adjourned special meeting to a time and place specified in the order of adjournment. Less than a quorum may so adjourn from time to time. If all members are absent from any regular or adjourned regular meeting the clerk or secretary of the legislative body may declare the meeting adjourned to a stated time and place and he shall cause a written notice of the adjournment to be given in the same manner as provided in Section 54956 for special meetings, unless such notice is waived as provided for special meetings. A copy of the order or notice of adjournment shall be conspicuously posted on or near the door of the place where the regular, adjourned regular, special or adjourned special meeting was held within 24 hours after the time of the adjournment. When a regular or adjourned regular meeting is adjourned as provided in this section, the resulting adjourned regular meeting is a regular meeting for all purposes. When an order of adjournment of any meeting fails to state the hour at which the adjourned meeting is to be held, it shall be held at the hour specified for regular meetings by ordinance, resolution, bylaw, or other rule.

**54955.1.     Continuance**

Any hearing being held, or noticed or ordered to be held, by a legislative body of a local agency at any meeting may by order or notice of continuance be continued or recontinued to any subsequent

67

26

meeting of the legislative body in the same manner and to the same extent set forth in Section 54955 for the adjournment of meetings; provided, that if the hearing is continued to a time less than 24 hours after the time specified in the order or notice of hearing, a copy of the order or notice of continuance of hearing shall be posted immediately following the meeting at which the order or declaration of continuance was adopted or made.

**54956.**       **Special meetings**

A special meeting may be called at any time by the presiding officer of the legislative body of a local agency, or by a majority of the members of the legislative body, by delivering written notice to each member of the legislative body and to each local newspaper of general circulation and radio or television station requesting notice in writing. The notice shall be delivered personally or by any other means and shall be received at least 24 hours before the time of the meeting as specified in the notice. The call and notice shall specify the time and place of the special meeting and the business to be transacted or discussed. No other business shall be considered at these meetings by the legislative body. The written notice may be dispensed with as to any member who at or prior to the time the meeting convenes files with the clerk or secretary of the legislative body a written waiver of notice. The waiver may be given by telegram. The written notice may also be dispensed with as to any member who is actually present at the meeting at the time it convenes.

The call and notice shall be posted at least 24 hours prior to the special meeting in a location that is freely accessible to members of the public.

**54956.5.**     **Emergency meetings**

(a)      For purposes of this section, "emergency situation" means both of the following:

(1)      An emergency, which shall be defined as a work stoppage, crippling activity, or other activity that severely impairs public health, safety, or both, as determined by a majority of the members of the legislative body.

(2)      A dire emergency, which shall be defined as a crippling disaster, mass destruction, terrorist act, or threatened terrorist activity that poses peril so immediate and significant that requiring a legislative body to provide one-hour notice before holding an emergency meeting under this section may endanger the public health, safety, or both, as determined by a majority of the members of the legislative body.

(b)      (1)      Subject to paragraph (2), in the case of an emergency situation involving matters upon which prompt action is necessary due to the disruption or threatened disruption of public facilities, a legislative body may hold an emergency meeting without complying with either the 24-hour notice requirement or the 24-hour posting requirement of Section 54956 or both of the notice and posting requirements.

68

27

(2)    Each local newspaper of general circulation and radio or television station that has requested notice of special meetings pursuant to Section 54956 shall be notified by the presiding officer of the legislative body, or designee thereof, one hour prior to the emergency meeting, or, in the case of a dire emergency, at or near the time that the presiding officer or designee notifies the members of the legislative body of the emergency meeting. This notice shall be given by telephone and all telephone numbers provided in the most recent request of a newspaper or station for notification of special meetings shall be exhausted. In the event that telephone services are not functioning, the notice requirements of this section shall be deemed waived, and the legislative body, or designee of the legislative body, shall notify those newspapers, radio stations, or television stations of the fact of the holding of the emergency meeting, the purpose of the meeting, and any action taken at the meeting as soon after the meeting as possible.

(c)    During a meeting held pursuant to this section, the legislative body may meet in closed session pursuant to Section 54957 if agreed to by a two-thirds vote of the members of the legislative body present, or, if less than two-thirds of the members are present, by a unanimous vote of the members present.

(d)    All special meeting requirements, as prescribed in Section 54956 shall be applicable to a meeting called pursuant to this section, with the exception of the 24-hour notice requirement.

(e)    The minutes of a meeting called pursuant to this section, a list of persons who the presiding officer of the legislative body, or designee of the legislative body, notified or attempted to notify, a copy of the rollcall vote, and any actions taken at the meeting shall be posted for a minimum of 10 days in a public place as soon after the meeting as possible.

**54956.6.    Fees**    $ 6,000 Bond Fee For Wayne?

No fees may be charged by the legislative body of a local agency for carrying out any provision of this chapter, except as specifically authorized by this chapter.

**54956.7.    Closed session; License application of rehabilitated criminal**

Whenever a legislative body of a local agency determines that it is necessary to discuss and determine whether an applicant for a license or license renewal, who has a criminal record, is sufficiently rehabilitated to obtain the license, the legislative body may hold a closed session with the applicant and the applicant's attorney, if any, for the purpose of holding the discussion and making the determination. If the legislative body determines, as a result of the closed session, that the issuance or renewal of the license should be denied, the applicant shall be offered the opportunity to withdraw the application. If the applicant withdraws the application, no record shall be kept of the discussions or decisions made at the closed session and all matters relating to the closed session shall be confidential. If the applicant does not withdraw the application, the legislative body shall take action at the public meeting during which the closed session is held or at its next public meeting denying the application for the license but all matters relating to the closed session are confidential and shall not

69

28

be disclosed without the consent of the applicant, except in an action by an applicant who has been denied a license challenging the denial of the license.

**54956.8.     Closed session; Real property negotiations**

Notwithstanding any other provision of this chapter, a legislative body of a local agency may hold a closed session with its negotiator prior to the purchase, sale, exchange, or lease of real property by or for the local agency to grant authority to its negotiator regarding the price and terms of payment for the purchase, sale, exchange, or lease.

However, prior to the closed session, the legislative body of the local agency shall hold an open and public session in which it identifies its negotiators, the real property or real properties which the negotiations may concern, and the person or persons with whom its negotiators may negotiate.

For purposes of this section, negotiators may be members of the legislative body of the local agency.

For purposes of this section, "lease" includes renewal or renegotiation of a lease.

Nothing in this section shall preclude a local agency from holding a closed session for discussions regarding eminent domain proceedings pursuant to Section 54956.9.

**54956.86.     Closed session; Health claims**

Notwithstanding any other provision of this chapter, a legislative body of a local agency which provides services pursuant to Section 14087.3 of the Welfare and Institutions Code may hold a closed session to hear a charge or complaint from a member enrolled in its health plan if the member does not wish to have his or her name, medical status, or other information that is protected by federal law publicly disclosed. Prior to holding a closed session pursuant to this section, the legislative body shall inform the member, in writing, of his or her right to have the charge or complaint heard in an open session rather than a closed session.

**54956.87.     Record exempt; Closed session; County health plan**

(a)     Notwithstanding any other provision of this chapter, the records of a health plan that is licensed pursuant to the Knox-Keene Health Care Service Plan Act of 1975 (Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code) and that is governed by a county board of supervisors, whether paper records, records maintained in the management information system, or records in any other form, that relate to provider rate or payment determinations, allocation or distribution methodologies for provider payments, formulae or calculations for these payments, and contract negotiations with providers of health care for alternative rates are exempt from disclosure for a period of three years after the contract is fully executed. The transmission of the records, or the information contained therein in an alternative form, to the board

70

of supervisors shall not constitute a waiver of exemption from disclosure, and the records and information once transmitted to the board of supervisors shall be subject to this same exemption.

(b)     Notwithstanding any other provision of law, the governing board of a health plan that is licensed pursuant to the Knox-Keene Health Care Service Plan Act of 1975 (Chapter 2.2 (commencing with Section 1340) of Division 2 of the Health and Safety Code) and that is governed by a county board of supervisors may order that a meeting held solely for the purpose of discussion or taking action on health plan trade secrets, as defined in subdivision (c) of Section 32106 of the Health and Safety Code, shall be held in closed session. The requirements of making a public report of action taken in closed session, and the vote or abstention of every member present, may be limited to a brief general description without the information constituting the trade secret.

(c)     The governing board may delete the portion or portions containing trade secrets from any documents that were finally approved in the closed session held pursuant to subdivision (b) that are provided to persons who have made the timely or standing request.

(d)     Nothing in this section shall be construed as preventing the governing board from meeting in closed session as otherwise provided by law.

(e)     The provisions of this section shall not prevent access to any records by the Joint Legislative Audit Committee in the exercise of its powers pursuant to Article 1 (commencing with Section 10500) of Chapter 4 of Part 2 of Division 2 of Title 2. The provisions of this section also shall not prevent access to any records by the Department of Corporations in the exercise of its powers pursuant to Article 1 (commencing with Section 1340) of Chapter 2.2 of Division 2 of the Health and Safety Code.

**54956.9.     Closed session; Pending litigation**

Nothing in this chapter shall be construed to prevent a legislative body of a local agency, based on advice of its legal counsel, from holding a closed session to confer with, or receive advice from, its legal counsel regarding pending litigation when discussion in open session concerning those matters would prejudice the position of the local agency in the litigation.

For purposes of this chapter, all expressions of the lawyer-client privilege other than those provided in this section are hereby abrogated. This section is the exclusive expression of the lawyer-client privilege for purposes of conducting closed-session meetings pursuant to this chapter.

For purposes of this section, "litigation" includes any adjudicatory proceeding, including eminent domain, before a court, administrative body exercising its adjudicatory authority, hearing officer, or arbitrator.

For purposes of this section, litigation shall be considered pending when any of the following circumstances exist:

71

(a)     Litigation, to which the local agency is a party, has been initiated formally.

(b)     (1)     A point has been reached where, in the opinion of the legislative body of the local agency on the advice of its legal counsel, based on existing facts and circumstances, there is a significant exposure to litigation against the local agency.

(2)     Based on existing facts and circumstances, the legislative body of the local agency is meeting only to decide whether a closed session is authorized pursuant to paragraph (1) of this subdivision.

(3)     For purposes of paragraphs (1) and (2), "existing facts and circumstances" shall consist only of one of the following:

(A)     Facts and circumstances that might result in litigation against the local agency but which the local agency believes are not yet known to a potential plaintiff or plaintiffs, which facts and circumstances need not be disclosed.

(B)     Facts and circumstances, including, but not limited to, an accident, disaster, incident, or transactional occurrence that might result in litigation against the agency and that are known to a potential plaintiff or plaintiffs, which facts or circumstances shall be publicly stated on the agenda or announced.

(C)     The receipt of a claim pursuant to the Tort Claims Act or some other written communication from a potential plaintiff threatening litigation, which claim or communication shall be available for public inspection pursuant to Section 54957.5.

(D)     A statement made by a person in an open and public meeting threatening litigation on a specific matter within the responsibility of the legislative body.

(E)     A statement threatening litigation made by a person outside an open and public meeting on a specific matter within the responsibility of the legislative body so long as the official or employee of the local agency receiving knowledge of the threat makes a contemporaneous or other record of the statement prior to the meeting, which record shall be available for public inspection pursuant to Section 54957.5.  The records so created need not identify the alleged victim of unlawful or tortious sexual conduct or anyone making the threat on their behalf, or identify a public employee who is the alleged perpetrator of any unlawful or tortious conduct upon which a threat of litigation is based, unless the identity of the person has been publicly disclosed.

(F)     Nothing in this section shall require disclosure of written communications that are privileged and not subject to disclosure pursuant to the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1).

31

(c)     Based on existing facts and circumstances, the legislative body of the local agency has decided to initiate or is deciding whether to initiate litigation.

Prior to holding a closed session pursuant to this section, the legislative body of the local agency shall state on the agenda or publicly announce the subdivision of this section that authorizes the closed session. If the session is closed pursuant to subdivision (a), the body shall state the title of or otherwise specifically identify the litigation to be discussed, unless the body states that to do so would jeopardize the agency's ability to effectuate service of process upon one or more unserved parties, or that to do so would jeopardize its ability to conclude existing settlement negotiations to its advantage.

A local agency shall be considered to be a "party" or to have a "significant exposure to litigation" if an officer or employee of the local agency is a party or has significant exposure to litigation concerning prior or prospective activities or alleged activities during the course and scope of that office or employment, including litigation in which it is an issue whether an activity is outside the course and scope of the office or employment.

## § 54956.95.   Closed session; Insurance liability

(a)     Nothing in this chapter shall be construed to prevent a joint powers agency formed pursuant to Article 1 (commencing with Section 6500) of Chapter 5 of Division 7 of Title 1, for purposes of insurance pooling, or a local agency member of the joint powers agency, from holding a closed session to discuss a claim for the payment of tort liability losses, public liability losses, or workers' compensation liability incurred by the joint powers agency or a local agency member of the joint powers agency.

(b)     Nothing in this chapter shall be construed to prevent the Local Agency Self-Insurance Authority formed pursuant to Chapter 5.5 (commencing with Section 6599.01) of Division 7 of Title 1, or a local agency member of the authority, from holding a closed session to discuss a claim for the payment of tort liability losses, public liability losses, or workers' compensation liability incurred by the authority or a local agency member of the authority.

(c)     Nothing in this section shall be construed to affect Section 54956.9 with respect to any other local agency.

## 54957.     Closed session; Personnel and threat to public security

(a)     Nothing contained in this chapter shall be construed to prevent the legislative body of a local agency from holding closed sessions with the Attorney General, district attorney, agency counsel, sheriff, or chief of police, or their respective deputies, or a security consultant or a security

32

operations manager, on matters posing a threat to the security of public buildings, a threat to the security of essential public services, including water, drinking water, wastewater treatment, natural gas service, and electric service, or a threat to the public's right of access to public services or public facilities.

(b)    (1)    Subject to paragraph (2), nothing contained in this chapter shall be construed to prevent the legislative body of a local agency from holding closed sessions during a regular or special meeting to consider the appointment, employment, evaluation of performance, discipline, or dismissal of a public employee or to hear complaints or charges brought against the employee by another person or employee unless the employee requests a public session.

(2)    As a condition to holding a closed session on specific complaints or charges brought against an employee by another person or employee, the employee shall be given written notice of his or her right to have the complaints or charges heard in an open session rather than a closed session, which notice shall be delivered to the employee personally or by mail at least 24 hours before the time for holding the session. If notice is not given, any disciplinary or other action taken by the legislative body against the employee based on the specific complaints or charges in the closed session shall be null and void.

(3)    The legislative body also may exclude from the public or closed meeting, during the examination of a witness, any or all other witnesses in the matter being investigated by the legislative body.

(4)    For the purposes of this subdivision, the term "employee" shall include an officer or an independent contractor who functions as an officer or an employee but shall not include any elected official, member of a legislative body or other independent contractors. Nothing in this subdivision shall limit local officials' ability to hold closed session meetings pursuant to Sections 1461, 32106, and 32155 of the Health and Safety Code or Sections 37606 and 37624.3 of the Government Code. Closed sessions held pursuant to this subdivision shall not include discussion or action on proposed compensation except for a reduction of compensation that results from the imposition of discipline.

## § 54957.1.    Report at conclusion of closed session

(a)    The legislative body of any local agency shall publicly report any action taken in closed session and the vote or abstention of every member present thereon, as follows:

(1)    Approval of an agreement concluding real estate negotiations pursuant to Section 54956.8 shall be reported after the agreement is final, as specified below:

(A)    If its own approval renders the agreement final, the body shall report that approval and the substance of the agreement in open session at the public meeting during which the closed session is held.

74

33

(B)    If final approval rests with the other party to the negotiations, the local agency shall disclose the fact of that approval and the substance of the agreement upon inquiry by any person, as soon as the other party or its agent has informed the local agency of its approval.

(2)    Approval given to its legal counsel to defend, or seek or refrain from seeking appellate review or relief, or to enter as an amicus curiae in any form of litigation as the result of a consultation under Section 54956.9 shall be reported in open session at the public meeting during which the closed session is held. The report shall identify, if known, the adverse party or parties and the substance of the litigation. In the case of approval given to initiate or intervene in an action, the announcement need not identify the action, the defendants, or other particulars, but shall specify that the direction to initiate or intervene in an action has been given and that the action, the defendants, and the other particulars shall, once formally commenced, be disclosed to any person upon inquiry, unless to do so would jeopardize the agency's ability to effectuate service of process on one or more unserved parties, or that to do so would jeopardize its ability to conclude existing settlement negotiations to its advantage.

(3)    Approval given to its legal counsel of a settlement of pending litigation, as defined in Section 54956.9, at any stage prior to or during a judicial or quasi-judicial proceeding shall be reported after the settlement is final, as specified below:

(A)    If the legislative body accepts a settlement offer signed by the opposing party, the body shall report its acceptance and identify the substance of the agreement in open session at the public meeting during which the closed session is held.

(B)    If final approval rests with some other party to the litigation or with the court, then as soon as the settlement becomes final, and upon inquiry by any person, the local agency shall disclose the fact of that approval, and identify the substance of the agreement.

(4)    Disposition reached as to claims discussed in closed session pursuant to Section 54956.95 shall be reported as soon as reached in a manner that identifies the name of the claimant, the name of the local agency claimed against, the substance of the claim, and any monetary amount approved for payment and agreed upon by the claimant.

(5)    Action taken to appoint, employ, dismiss, accept the resignation of, or otherwise affect the employment status of a public employee in closed session pursuant to Section 54957 shall be reported at the public meeting during which the closed session is held. Any report required by this paragraph shall identify the title of the position. The general requirement of this paragraph notwithstanding, the report of a dismissal or of the nonrenewal of an employment contract shall be deferred until the first public meeting following the exhaustion of administrative remedies, if any.

34

(6)     Approval of an agreement concluding labor negotiations with represented employees pursuant to Section 54957.6 shall be reported after the agreement is final and has been accepted or ratified by the other party.  The report shall identify the item approved and the other party or parties to the negotiation.

(b)     Reports that are required to be made pursuant to this section may be made orally or in writing.  The legislative body shall provide to any person who has submitted a written request to the legislative body within 24 hours of the posting of the agenda, or to any person who has made a standing request for all documentation as part of a request for notice of meetings pursuant to Section 54954.1 or 54956, if the requester is present at the time the closed session ends, copies of any contracts, settlement agreements, or other documents that were finally approved or adopted in the closed session.  If the action taken results in one or more substantive amendments to the related documents requiring retyping, the documents need not be released until the retyping is completed during normal business hours, provided that the presiding officer of the legislative body or his or her designee orally summarizes the substance of the amendments for the benefit of the document requester or any other person present and requesting the information.

(c)     The documentation referred to in paragraph (b) shall be available to any person on the next business day following the meeting in which the action referred to is taken or, in the case of substantial amendments, when any necessary retyping is complete.

(d)     Nothing in this section shall be construed to require that the legislative body approve actions not otherwise subject to legislative body approval.

(e)     No action for injury to a reputational, liberty, or other personal interest may be commenced by or on behalf of any employee or former employee with respect to whom a disclosure is made by a legislative body in an effort to comply with this section.

**54957.2.     Minutes of closed session**

(a)     The legislative body of a local agency may, by ordinance or resolution, designate a clerk or other officer or employee of the local agency who shall then attend each closed session of the legislative body and keep and enter in a minute book a record of topics discussed and decisions made at the meeting.  The minute book made pursuant to this section is not a public record subject to inspection pursuant to the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1), and shall be kept confidential.  The minute book shall be available only to members of the legislative body or, if a violation of this chapter is alleged to have occurred at a closed session, to a court of general jurisdiction wherein the local agency lies.  Such minute book may, but need not, consist of a recording of the closed session.

(b)     An elected legislative body of a local agency may require that each legislative body all or a majority of whose members are appointed by or under the authority of the elected legislative body keep a minute book as prescribed under subdivision (a).

**54957.5.**     **Agendas and other materials; Public records**

(a)     Notwithstanding Section 6255 or any other provisions of law, agendas of public meetings and any other writings, when distributed to all, or a majority of all, of the members of a legislative body of a local agency by any person in connection with a matter subject to discussion or consideration at a public meeting of the body, are disclosable public records under the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1), and shall be made available upon request without delay. However, this section shall not include any writing exempt from public disclosure under Section 6253.5, 6254, 6254.7, or 6254.22.

(b)     Writings that are public records under subdivision (a) and that are distributed during a public meeting shall be made available for public inspection at the meeting if prepared by the local agency or a member of its legislative body, or after the meeting if prepared by some other person. These writings shall be made available in appropriate alternative formats upon request by a person with a disability, as required by Section 202 of the Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof.

(c)     Nothing in this chapter shall be construed to prevent the legislative body of a local agency from charging a fee or deposit for a copy of a public record pursuant to Section 6253, except that no surcharge shall be imposed on persons with disabilities in violation of Section 202 of the Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof.

(d)     This section shall not be construed to limit or delay the public's right to inspect or obtain a copy of any record required to be disclosed under the requirements of the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1). Nothing in this chapter shall be construed to require a legislative body of a local agency to place any paid advertisement or any other paid notice in any publication.

**54957.6.**     **Closed session; Labor negotiations**

(a)     Notwithstanding any other provision of law, a legislative body of a local agency may hold closed sessions with the local agency's designated representatives regarding the salaries, salary schedules, or compensation paid in the form of fringe benefits of its represented and unrepresented employees, and, for represented employees, any other matter within the statutorily provided scope of representation.

However, prior to the closed session, the legislative body of the local agency shall hold an open and public session in which it identifies its designated representatives.

Closed sessions of a legislative body of a local agency, as permitted in this section, shall be for the purpose of reviewing its position and instructing the local agency's designated representatives.

36

Closed sessions, as permitted in this section, may take place prior to and during consultations and discussions with representatives of employee organizations and unrepresented employees.

Closed sessions with the local agency's designated representative regarding the salaries, salary schedules, or compensation paid in the form of fringe benefits may include discussion of an agency's available funds and funding priorities, but only insofar as these discussions relate to providing instructions to the local agency's designated representative.

Closed sessions held pursuant to this section shall not include final action on the proposed compensation of one or more unrepresented employees.

For the purposes enumerated in this section, a legislative body of a local agency may also meet with a state conciliator who has intervened in the proceedings.

(b)     For the purposes of this section, the term "employee" shall include an officer or an independent contractor who functions as an officer or an employee, but shall not include any elected official, member of a legislative body, or other independent contractors.

## 54957.7.     Announcement prior to closed sessions

(a)     Prior to holding any closed session, the legislative body of the local agency shall disclose, in an open meeting, the item or items to be discussed in the closed session. The disclosure may take the form of a reference to the item or items as they are listed by number or letter on the agenda. In the closed session, the legislative body may consider only those matters covered in its statement. Nothing in this section shall require or authorize a disclosure of information prohibited by state or federal law.

(b)     After any closed session, the legislative body shall reconvene into open session prior to adjournment and shall make any disclosures required by Section 54957.1 of action taken in the closed session.

(c)     The announcements required to be made in open session pursuant to this section may be made at the location announced in the agenda for the closed session, as long as the public is allowed to be present at that location for the purpose of hearing the announcements.

## 54957.8.     Closed session; Multijurisdictional drug enforcement agency

Nothing contained in this chapter shall be construed to prevent the legislative body of a multijurisdictional drug law enforcement agency, or an advisory body of a multijurisdictional drug law enforcement agency, from holding closed sessions to discuss the case records of any ongoing criminal

37

investigation of the multijurisdictional drug law enforcement agency or of any party to the joint powers agreement, to hear testimony from persons involved in the investigation, and to discuss courses of action in particular cases.

"Multijurisdictional drug law enforcement agency," for purposes of this section, means a joint powers entity formed pursuant to Article 1 (commencing with Section 6500) of Chapter 5 of Division 7 of Title 1, which provides drug law enforcement services for the parties to the joint powers agreement.

The Legislature finds and declares that this section is within the public interest, in that its provisions are necessary to prevent the impairment of ongoing law enforcement investigations, to protect witnesses and informants, and to permit the discussion of effective courses of action in particular cases.

**54957.9.   Disruption of meeting**

In the event that any meeting is willfully interrupted by a group or groups of persons so as to render the orderly conduct of such meeting unfeasible and order cannot be restored by the removal of individuals who are willfully interrupting the meeting, the members of the legislative body conducting the meeting may order the meeting room cleared and continue in session. Only matters appearing on the agenda may be considered in such a session. Representatives of the press or other news media, except those participating in the disturbance, shall be allowed to attend any session held pursuant to this section. Nothing in this section shall prohibit the legislative body from establishing a procedure for readmitting an individual or individuals not responsible for willfully disturbing the orderly conduct of the meeting.

**54957.10.   Closed session; Deferred Compensation Plan; Early withdrawal**

Notwithstanding any other provision of law, a legislative body of a local agency may hold closed sessions to discuss a local agency employee's application for early withdrawal of funds in a deferred compensation plan when the application is based on financial hardship arising from an unforeseeable emergency due to illness, accident, casualty, or other extraordinary event, as specified in the deferred compensation plan.

**54958.   Act supercedes conflicting laws**

The provisions of this chapter shall apply to the legislative body of every local agency notwithstanding the conflicting provisions of any other state law.

**54959.   Violation of Act; Criminal penalty**

Each member of a legislative body who attends a meeting of that legislative body where action is taken in violation of any provision of this chapter, and where the member intends to deprive the

38

public of information to which the member knows or has reason to know the public is entitled under this chapter, is guilty of a misdemeanor.

**54960.          Violation of Act; Civil remedies**

(a)     The district attorney or any interested person may commence an action by mandamus, injunction or declaratory relief for the purpose of stopping or preventing violations or threatened violations of this chapter by members of the legislative body of a local agency or to determine the applicability of this chapter to actions or threatened future action of the legislative body, or to determine whether any rule or action by the legislative body to penalize or otherwise discourage the expression of one or more of its members is valid or invalid under the laws of this state or of the United States, or to compel the legislative body to tape record its closed sessions as hereinafter provided.

(b)     The court in its discretion may, upon a judgment of a violation of Section 54956.7, 54956.8, 54956.9, 54956.95, 54957, or 54957.6, order the legislative body to tape record its closed sessions and preserve the tape recordings for the period and under the terms of security and confidentiality the court deems appropriate.

(c)     (1)     Each recording so kept shall be immediately labeled with the date of the closed session recorded and the title of the clerk or other officer who shall be custodian of the recording.

(2)     The tapes shall be subject to the following discovery procedures:

(A)     In any case in which discovery or disclosure of the tape is sought by either the district attorney or the plaintiff in a civil action pursuant to Section 54959, 54960, or 54960.1 alleging that a violation of this chapter has occurred in a closed session which has been recorded pursuant to this section, the party seeking discovery or disclosure shall file a written notice of motion with the appropriate court with notice to the governmental agency which has custody and control of the tape recording.  The notice shall be given pursuant to subdivision (b) of Section 1005 of the Code of Civil Procedure.

(B)     The notice shall include, in addition to the items required by Section 1010 of the Code of Civil Procedure, all of the following:

(i)     Identification of the proceeding in which discovery or disclosure is sought, the party seeking discovery or disclosure, the date and time of the meeting recorded, and the governmental agency which has custody and control of the recording.

(ii)     An affidavit which contains specific facts indicating that a violation of the act occurred in the closed session.

89

(3)     If the court, following a review of the motion, finds that there is good cause to believe that a violation has occurred, the court may review, in camera, the recording of that portion of the closed session alleged to have violated the act.

(4)     If, following the in camera review, the court concludes that disclosure of a portion of the recording would be likely to materially assist in the resolution of the litigation alleging violation of this chapter, the court shall, in its discretion, make a certified transcript of the portion of the recording a public exhibit in the proceeding. '

(5)     Nothing in this section shall permit discovery of communications which are protected by the attorney-client privilege.

**54960.1.     Violation of Act; Actions declared null and void**

(a)     The district attorney or any interested person may commence an action by mandamus or injunction for the purpose of obtaining a judicial determination that an action taken by a legislative body of a local agency in violation of Section 54953, 54954.2, 54954.5, 54954.6, 54956, or 54956.5 is null and void under this section. Nothing in this chapter shall be construed to prevent a legislative body from curing or correcting an action challenged pursuant to this section.

(b)     Prior to any action being commenced pursuant to subdivision (a), the district attorney or interested person shall make a demand of the legislative body to cure or correct the action alleged to have been taken in violation of Section 54953, 54954.2, 54954.5, 54954.6, 54956, or 54956.5. The demand shall be in writing and clearly describe the challenged action of the legislative body and nature of the alleged violation.

(c)     (1)     The written demand shall be made within 90 days from the date the action was taken unless the action was taken in an open session but in violation of Section 54954.2, in which case the written demand shall be made within 30 days from the date the action was taken.

(2)     Within 30 days of receipt of the demand, the legislative body shall cure or correct the challenged action and inform the demanding party in writing of its actions to cure or correct or inform the demanding party in writing of its decision not to cure or correct the challenged action.

(3)     If the legislative body takes no action within the 30-day period, the inaction shall be deemed a decision not to cure or correct the challenged action, and the 15-day period to commence the action described in subdivision (a) shall commence to run the day after the 30-day period to cure or correct expires.

(4)     Within 15 days of receipt of the written notice of the legislative body's decision to cure or correct, or not to cure or correct, or within 15 days of the expiration of the 30-day period to cure or correct, whichever is earlier, the demanding party shall be required to commence the action pursuant to subdivision (a) or thereafter be barred from commencing the action.

81

(d)     An action taken that is alleged to have been taken in violation of Section 54953, 54954.2, 54954.5, 54954.6, 54956, or 54956.5 shall not be determined to be null and void if any of the following conditions exist:

(1)     The action taken was in substantial compliance with Sections 54953, 54954.2, 54954.5, 54954.6, 54956, and 54956.5.

(2)     The action taken was in connection with the sale or issuance of notes, bonds, or other evidences of indebtedness or any contract, instrument, or agreement thereto.

(3)     The action taken gave rise to a contractual obligation, including a contract let by competitive bid other than compensation for services in the form of salary or fees for professional services, upon which a party has, in good faith and without notice of a challenge to the validity of the action, detrimentally relied.

(4)     The action taken was in connection with the collection of any tax.

(5)     Any person, city, city and county, county, district, or any agency or subdivision of the state alleging noncompliance with subdivision (a) of Section 54954.2, Section 54956, or Section 54956.5, because of any defect, error, irregularity, or omission in the notice given pursuant to those provisions, had actual notice of the item of business at least 72 hours prior to the meeting at which the action was taken, if the meeting was noticed pursuant to Section 54954.2, or 24 hours prior to the meeting at which the action was taken if the meeting was noticed pursuant to Section 54956, or prior to the meeting at which the action was taken if the meeting is held pursuant to Section 54956.5.

(e)     During any action seeking a judicial determination pursuant to subdivision (a) if the court determines, pursuant to a showing by the legislative body that an action alleged to have been taken in violation of Section 54953, 54954.2, 54954.5, 54954.6, 54956, or 54956.5 has been cured or corrected by a subsequent action of the legislative body, the action filed pursuant to subdivision (a) shall be dismissed with prejudice.

(f)     The fact that a legislative body takes a subsequent action to cure or correct an action taken pursuant to this section shall not be construed or admissible as evidence of a violation of this chapter.

## 54960.5.     Costs and attorney fees

A court may award court costs and reasonable attorney fees to the plaintiff in an action brought pursuant to Section 54960 or 54960.1 where it is found that a legislative body of the local agency has violated this chapter. The costs and fees shall be paid by the local agency and shall not become a personal liability of any public officer or employee of the local agency.

82

41

A court may award court costs and reasonable attorney fees to a defendant in any action brought pursuant to Section 54960 or 54960.1 where the defendant has prevailed in a final determination of such action and the court finds that the action was clearly frivolous and totally lacking in merit.

**54961.**       **Discrimination; Disabled access; Fees for attendance; Disclosure of victims**

(a)       No legislative body of a local agency shall conduct any meeting in any facility that prohibits the admittance of any person, or persons, on the basis of race, religious creed, color, national origin, ancestry, or sex, or which is inaccessible to disabled persons, or where members of the public may not be present without making a payment or purchase. This section shall apply to every local agency as defined in Section 54951.

(b)       No notice, agenda, announcement, or report required under this chapter need identify any victim or alleged victim of tortious sexual conduct or child abuse unless the identity of the person has been publicly disclosed.

**54962.**       **Closed session; Express authorization required**

Except as expressly authorized by this chapter, or by Sections 1461, 1462, 32106, and 32155 of the Health and Safety Code or Sections 37606 and 37624.3 of the Government Code as they apply to hospitals, or by any provision of the Education Code pertaining to school districts and community college districts, no closed session may be held by any legislative body of any local agency.

**54963.**       **Closed session; Disclosure of confidential information**

(a)       A person may not disclose confidential information that has been acquired by being present in a closed session authorized by Section 54956.7, 54956.8, 54956.86, 54956.87, 54956.9, 54957, 54957.6, 54957.8, or 54957.10 to a person not entitled to receive it, unless the legislative body authorizes disclosure of that confidential information.

(b)       For purposes of this section, "confidential information" means a communication made in a closed session that is specifically related to the basis for the legislative body of a local agency to meet lawfully in closed session under this chapter.

(c)       Violation of this section may be addressed by the use of such remedies as are currently available by law, including, but not limited to:

(1)       Injunctive relief to prevent the disclosure of confidential information prohibited by this section.

(2)       Disciplinary action against an employee who has willfully disclosed confidential information in violation of this section.

(3)     Referral of a member of a legislative body who has willfully disclosed confidential information in violation of this section to the grand jury.

(d)     Disciplinary action pursuant to paragraph (2) of subdivision (c) shall require that the employee in question has either received training as to the requirements of this section or otherwise has been given notice of the requirements of this section.

(e)     A local agency may not take any action authorized by subdivision (c) against a person, nor shall it be deemed a violation of this section, for doing any of the following:

(1)     Making a confidential inquiry or complaint to a district attorney or grand jury concerning a perceived violation of law, including disclosing facts to a district attorney or grand jury that are necessary to establish the illegality of an action taken by a legislative body of a local agency or the potential illegality of an action that has been the subject of deliberation at a closed session if that action were to be taken by a legislative body of a local agency.

(2)     Expressing an opinion concerning the propriety or legality of actions taken by a legislative body of a local agency in closed session, including disclosure of the nature and extent of the illegal or potentially illegal action.

(3)     Disclosing information acquired by being present in a closed session under this chapter that is not confidential information.

(f)     Nothing in this section shall be construed to prohibit disclosures under the whistleblower statutes contained in Section 1102.5 of the Labor Code or Article 4.5 (commencing with Section 53296) of Chapter 2 of this code.

43

# EXHIBIT B

44

# RULES OF THE

# LOS ANGELES BOARD OF POLICE COMMISSIONERS



# SEPTEMBER 15, 2015

exhibit B                                          45

# LOS ANGELES POLICE COMMISSION

## Rules for Public Attendance and Participation at Meetings of the Board of Police Commissioners

### I.  Purpose

The purpose of these rules is to establish an appropriate level of safety and efficiency in the meeting room of the Board of Police Commissioners ("Board") for Police Department stakeholders and other members of the public attending and/or addressing the Board.  The ability of all interested persons attending public meetings to safely and efficiently participate in the business of the Commission and to observe the Board members in the performance of their duties is of paramount importance to the Board.  The Board also has a compelling interest in the efficient transaction of business, free from actual disruption.  Toward that end, the following rules have been promulgated to facilitate the conduct of public meetings in an open, orderly and efficient manner and in an environment safe for all persons in attendance.

### II. Access to the Police Headquarters Facility (PHF)

Visitors to the PHF must first check in at the front desk on the first floor.  All visitors attending a meeting of the Board of Police Commissioners shall pass through the security screening (i.e., magnetometer, bag search), and obtain a visitor's pass which must be worn on the front of the torso and must be visible at all times while in the building.

All visitors to the PHF are required to remain in Public Areas at all times.  Public Areas are: 1) the ground floor lobby; and 2) the Board room and adjacent entry corridor and lobby area restrooms.  Visitors are not allowed in secured areas such as the elevator lobby, staff office areas, conference rooms and other work areas, unless accompanied at all times by a Police Department/Commission employee and for a specific invited business purpose.

### III. Access to the Board Room

Visitors to the PHF who desire to attend meetings of the Board shall not be required to register their names or otherwise provide any other information to enter into the Board room. Non-badged public meeting attendees must, however, display a visitor's pass.  Where a public meeting attendee wishes to maintain his or her anonymity, he or she will not be required to write his or her name on the visitor's pass and such pass may remain blank, except for the designation "Police Commission."

Public meeting attendees shall be required to leave the PHF immediately following the adjournment of the public meeting and must exit the building from the ground floor lobby.

#### A.  Capacity of the Board Room

Each member of the audience must be seated.  Standees are not permitted in the Board room except for Police Department/Commission Sergeants-at-arms or authorized media representatives in possession of a Department-issued Press Pass.

4/6

Rules for Public Attendance and Participation at Meetings
of the Board of Police Commissioners
Page 2
1.0

Whenever the President anticipates that the number of persons attending a Board meeting may exceed the legal capacity of the Board Room, an alternate room within the PHF (overflow room), equipped with live audio of the meeting will be opened to the public, when available. Opportunities to address the Board will be made equally available to members of the public from both rooms, and the Rules set forth herein shall apply in both rooms.

B.  Special Accommodations

The Police Commission is committed to ensuring equal access to its meetings.  It is requested that individuals who require the services of a translator contact the Board Secretary no later than the day preceding the meeting.  Whenever possible, a translator will be provided.

Sign language interpreters, assistive listening devices, or other auxiliary aids and/or services may be provided upon request.  To ensure availability, you are advised to make your request at least 72 hours prior to the meeting you wish to attend.

IV. Speaking Before the Board

While the Board invites public participation in the business of the Commission, meetings of the Board are not traditional public forums where speakers have a right to speak freely on any topic of interest to the speaker.  Meetings of the Board are regulated limited public forums and are strictly limited to topics directly concerning the subject matter or business of the Police Commission generally, or the individual agenda topics noticed for review.

A.  Scope of Public Comment

Members of the public may address the Board orally at Board meetings on either: 1) specific agendized matters of business, or 2) at the general Public Comment portion of the meeting.  Public comment on an agendized item shall be taken prior to the Board taking action on such matter.  Speakers on agendized matters shall limit their comments to the specific agendized matter of business.

Time will be allotted at every meeting for general Public Comment.  During general Public Comment, members of the public may speak on matters within the subject matter jurisdiction of the Board.  Speakers shall limit their comments to matters relating to the business of the Police Commission.

Members of the public who have submitted speaker cards for either an agendized item or general Public Comment shall address the Board from the podium.

B.  Speaker Cards

A person wishing to address the Board on an agendized matter or during general Public Comment is requested to complete and submit a speaker card to a Sergeant-at-Arms, who will deliver it to the Board secretary, for each agenda item on which he or she wishes to speak.  No speaker cards will be accepted once public comment has begun on the specific agenda item for which a card is being submitted or, with respect to general Public Comment, once the general

47

Rules for Public Attendance and Participation at Meetings
of the Board of Police Commissioners
Page 3
1.0

Public Comment period has commenced. Individuals will be called in the order in which the speaker cards were submitted by the Sergeant-at-Arms to the Board secretary.

C. Time Limits

Each person timely submitting a Speaker card shall be permitted to speak for a maximum of two (2) minutes on each item for which a card has been submitted. Where greater than ten (10) speaker cards are received for a particular item or for general Public Comment, the Presiding Officer may, in the exercise of his or her discretion, reduce the time limit for comment to one minute. Time cannot be ceded to another speaker, and an individual may speak only once during any individual agenda item, and once during general Public Comment.

## V. Decorum

### A. Persons Addressing the Board

Each person who addresses the Board shall do so only from the podium and shall refrain from speaking beyond the allotted time or making remarks which are not relevant to the specific agenda item for which public comment is being given.

Speakers shall direct all remarks to the Board as a whole.

### B. Members of the Audience

No person in the audience at a Board meeting shall engage in any acts which cause an actual disruption of the meeting by preventing or impeding the Board's ability to accomplish its business in a reasonably efficient manner.

Signs, posters, banners or other display material which disrupt or otherwise impede the orderly conduct of the meeting or which create any obstruction to another person's attendance at or participation in the meeting are prohibited.

Members of the public or press attending a meeting of the Board may record and/or photograph the proceedings, unless such activities or the manner in which they are carried out cause a disruption of the meeting.

## VI. Enforcement

The Presiding Officer shall be charged with enforcing the provisions of these Rules, with the assistance of Board staff, the Sergeants-at-Arms, and other necessary Police Department personnel.

### A. Presiding Officer

The Presiding Officer at meetings of the Board shall be the President of the Board, or his/her designee. The Presiding Officer is charged with maintaining order during meetings and enforcing the provisions of these Rules including, but not limited to violations of:

48

Rules for Public Attendance and Participation at Meetings
of the Board of Police Commissioners
Page 4
1.0

- The limitations on the scope of public comment set forth in Rule IV.A, above;
- The limitations on speaker time set forth in Rule IV.C, above; and
- The decorum requirements set forth in Rule V, above.

### B. Warnings

The Presiding Officer shall request that a person who is breaching the Rules cease and desist from such conduct. In such a case, the Presiding Officer shall advise said individual(s) that a failure to cease and desist may lead to the termination of his or her remaining Public Comment time.

### C. Removal For Actual Disruption

If, after being warned by the Presiding Officer, the individual(s) persist in causing an actual disruption of the meeting, the Presiding Officer may order the individual(s) to leave the meeting. If the individual(s) do not remove themselves, the Presiding Officer may order any law enforcement officer to facilitate the removal of the noncompliant individual(s) from the Board room.

Any person so removed shall be excluded from further attendance at the meeting from which he or she was removed.

Any person who resists removal from the Board room (or other area where a meeting is held) by a law enforcement officer may be subject to arrest for violation of the Penal Code or other applicable Los Angeles Municipal Code sections.

### D. Recess Due to Inability to Restore Order

In the event that a meeting is willfully interrupted by a group or groups of persons so as to render the orderly conduct of the meeting infeasible and order cannot be restored by the removal of individuals who are willfully interrupting the meeting, the Presiding Officer may call for a recess, order the meeting room cleared and subsequently reconvene the meeting. Where the Board elects to proceed in this manner, only agendized items shall be considered, and representatives of the press or other news media not previously engaged in the disturbance shall be allowed to remain present and attend such session.

Adopted by a majority vote of the Board of Police Commissioners at a regular Commission meeting on _September 15_, 2015.

BOARD OF
POLICE COMMISSIONERS
Approved _September 15, 20_
Secretary _Maria Silva_

49

# EXHIBIT C

*Hostile Agenda Transfer*

**WV-120**    **Response to Petition for Workplace Violence Restraining Orders**

Clerk stamps date here when form is filed.

**Use this form to respond to the *Petition* (Form WV-100)**

- Read *How Can I Respond to a Petition for Workplace Violence Restraining Orders (Form WV-120-INFO)?*, to protect your rights.

- Fill out this form and take it to the court clerk.

- Have someone age 18 or older—not you—serve the petitioner or the petitioner's lawyer by mail with a copy of this form and any attached pages. *(Use Form WV-250, Proof of Service of Response by Mail.)*

① **Petitioner (Employer)**

Name: _____

② **Employee Seeking Protection**

Full Name: _____

③ **Respondent (Person From Whom Protection Is Sought)**

a.  Your Name:  Michael Hunt

Your Lawyer *(if you have one for this case):*

Name:  Pro Per                          State Bar No.: _____

Firm Name: _____

b.  Your Address *(you may give a mailing address if you want to keep your street address private; skip this if you have a lawyer):*

Address: 1200 Wilshire Blvd Suite 650

City:  Los Angeles           State:  CA      Zip:  90017

Telephone:  (310) 925-2996     Fax:  (213)

E-Mail Address: _____

*Fill in court name and street address:*

Superior Court of California, County of Los Angeles, Central District 111 North Hill Street, Los Angeles, CA 90012

*Court fills in case number when form is filed.*

Case Number:
BS162858

The court will consider your response at the hearing. Write your hearing date, time, and place from Form WV-109, item ④ here:

**Hearing Date**    Date: _____  Time: _____

Dept.: _____   Room: _____

**If you were served with a Temporary Restraining Order, you must obey it until the hearing. At the hearing, the court may make orders against you that last for up to three years.**

④ ☐ **Personal Conduct Orders**

a.  ☐  I agree to the orders requested.

b.  ☒  I do not agree to the orders requested.

c.  ☐  I agree to the following orders *(specify):*  **California Government Code Section 54950 The Ralph M. Brown Act, · Addendum B - Dowd vs. City of Los Angeles Brand vs. Ohio, Hunt vs. City of Los Angeles, CA Counsel does not get to say whis offensive - I never threatened Mr. Mitch O'Farrell.**

⑤ ☐ **Stay-Away Orders**

a.  ☐  I agree to the orders requested.

b.  ☒  I do not agree to the orders requested.

c.  ☐  I agree to the following orders *(specify):* _____

_____

_____

_____

Judicial Council of California, www.courts.ca.gov
Revised July 1, 2014, Mandatory Form
Code of Civil Procedure, §§ 527.85 and 527.9

**Response to Petition for Workplace Violence Restraining Orders**

**(Workplace Violence Prevention)**

WV-120, Page 1 of 3

→

*exhibit C*          *51*

LOCAL / CITY HALL

# L.A. pays $215,000 to settle suit by man who wore KKK hood to meeting



Los Angeles Parks and Recreation Commissioner Barry Sanders at a 2011 meeting. Sanders presided over a hearing that same year where Michael Hunt wore a Ku Klux Klan hood and was kicked out. (Bob Chamberlin, Los Angeles Times)

 By **David Zahniser** · Contact Reporter

JUNE 12, 2014, 8:27 PM

L os Angeles will pay $215,000 to end a free-speech lawsuit involving a man who was kicked out of a public meeting after showing up wearing a Ku Klux Klan hood.

Council members voted unanimously Wednesday to settle the lawsuit with Venice resident Michael Hunt, who said city leaders had violated his constitutional rights by ejecting him from a session of

exh.3.7 D

the Department of Recreation and Parks' Board of Commissioners in 2011. Hunt, who is black, attended the meeting while wearing both the KKK hood and a T-shirt that featured a profanity and a racial slur used to describe African Americans.

At the 2011 meeting, then-commission President Barry Sanders told Hunt his outfit violated the city's rules of decorum and said Hunt would be ejected if he did not remove the KKK headgear and "offensive signage." Hunt was later escorted out by officers and received a citation for disturbing a public assembly, according to his lawsuit.

The city declined to prosecute and the citation was dismissed. But Hunt, a vendor on the Venice Boardwalk, said he had been wrongfully arrested and accused the city of violating his rights to free speech, assembly and due process by preventing him from speaking at the meeting.

Attorney Stephen Rohde, who represented Hunt, said the settlement "means that the city is held accountable when it violates civil rights and 1st Amendment rights."

"These rules of decorum should not be used to silence people unless they engage in actual disruption of the meeting," he said. "And actual disruption doesn't mean upsetting people or offending people."

**“**

# These rules of decorum should not be used to silence people unless they engage in actual disruption of the meeting.

— Stephen Rohde, attorney

Councilman Bernard C. Parks described the payment as a "business decision," arguing that the city would have had to pay far more had the case gone to trial. A judge in a separate federal case recently found that Los Angeles violated the free speech rights of two other men who were repeatedly ejected from council meetings.

Although a jury awarded each man only $1 over that matter, the city still had to pay around $600,000 in legal fees for that case, Parks said. Rohde also was the plaintiffs' attorney in that lawsuit.

"This is one of those things where you hold your nose and vote," Parks said. "If this thing had gone to a trial and [Hunt] had gotten $1, the attorneys' fees would have been larger than what we paid to settle it."

The parks commission's rules of decorum prohibit audience members from engaging in "disorderly or

boisterous conduct," including threatening or abusive language, whistling, or stamping of feet.

Government agencies legally can use such rules to restrict disruptive speech, but the disruption has to be so great that the agency is incapable of conducting its public business, according to a report on Hunt's case sent to the council by City Atty. Mike Feuer.

Witnesses at the 2011 meeting did not think Hunt had been a disruption, Feuer's report said.

"Rather most of those in attendance felt that [Hunt's] garb was only mildly distracting and confusing, and that under the circumstances, he should have been allowed to stay," the report said.

Rohde said his client has worn the KKK hood and the T-shirt with the racial slur to various meetings to turn the tables on a city government he believes is "engaging in discrimination."

"He has co-opted these images and uses them to protest back against the city," he said.

The settlement is not Hunt's first victory over the city. He previously received a $264,286 jury award stemming from a 2009 lawsuit in which he challenged the city's vending restrictions on the Venice Boardwalk. The city also paid Hunt's attorney $340,000 in legal fees in that case.

Hunt alleged in his latest lawsuit that the city's handling of the 2011 meeting caused him to experience emotional distress, among other things. The city's lawyers, in turn, said Hunt "beseeched" the officers who escorted him from the room for 20 minutes to give him a citation.

Once he was outside the meeting room, Hunt removed his hood and thanked the security officers for providing him with a "big payday," according to the city's report on the case.

Rohde said his client made no such statement.

"I do think he told the authorities that this was a big mistake and he wanted to hold them accountable," Rohde said. "They may have heard it differently."

*david.zahniser@latimes.com*

**Follow @DavidZahniser for news from Los Angeles City Hall**

Copyright © 2016, Los Angeles Times

**This article is related to:** Trials and Arbitration, Justice System, Ku Klux Klan, Racism

# EXHIBIT E

57

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
JOSEPH A. LANE, CLERK

DIVISION 3

March 21, 2017

OFFICE OF THE CITY ATTORNEY,
Petitioner and Respondent,
v.
WAYNE SPINDLER,
Appellant.

B276413
Los Angeles County No. BS162097

### \*\*\*NOTICE RE:   RULE 8.155(b) (8.340(b))   -   BRIEFING STAYED\*\*\*

Dear Counsel:

    This court has received a copy of Appellant's notice dated March 21, 2017.   It now appears that the record in the above-entitled matter is incomplete, you are hereby notified that the briefing in this matter is stayed pending the filing of the supplemental record on appeal.   Appellant's brief is due 30 days from the date of the filing of the supplemental record.

Very truly yours,
Joseph A. Lane, Clerk

by:_____
      Deputy Clerk

cc:    Wayne Spindler
      Hugo Stephen Rossitter
      File

Second Appellate District, Div. Three
300 South Spring Street
Los Angeles, CA   90013
(213) 830-7000
www.courts.ca.gov/2dca

exhibit E                    58

# EXHIBIT F

# WV-109   Notice of Court Hearing

Clerk stamps date here when form is filed.

**DEFENDANT FILED**

Superior Court of California
County of Los Angeles

MAY 19 2016

Sherri R. Carter, Executive Officer/Clerk

By _____, Deputy
Veronica Cabrera

## ① Petitioner (Employer)

a. Name: __Office of the City Attorney__

Lawyer for Petitioner *(if any for this case)*:

Name: __Hugo S. Rossitter__   State Bar No.: __079335__

Firm Name: __Office of the City Attorney__

b. Address *(If you have a lawyer, give your lawyer's information.)*:

Address: __200 N. Main Street__

City: __Los Angeles__   State: __CA__   Zip: __90012__

Telephone: __213-978-7153__   Fax: __213-978-8315__

E-Mail Address: __hugo.rossitter@lacity.org__

Fill in court name and street address:

Superior Court of California, County of
__Los Angeles__
__111 N. Hill Street__
__Los Angeles, CA  90012__

## ② Employee in Need of Protection

Full Name: __Herman J. Wesson__

Fill in case number:

Case Number:

__BS162997__

## ③ Respondent (Person From Whom Protection Is Sought)

Full Name: __Wayne Spindler__

*The court will complete the rest of this form.*

## ④ Notice of Hearing

**A court hearing is scheduled on the request for restraining orders against the respondent:**

| Hearing Date → | Date: __6/10/16__   Time: __8:30__ | Name and address of court if different from above: |
|---|---|---|
| | Dept.: __X__   Room: __247__ | |

## ⑤ Temporary Restraining Orders *(Any orders granted are on Form WV-110, served with this notice.)*

a. Temporary Restraining Orders for personal conduct and stay away orders as requested in Form WV-100,
*Request for Workplace Violence Restraining Orders, are (check only one box below)*:

(1) [X] All **GRANTED** until the court hearing.

(2) [ ] All **DENIED** until the court hearing. *(Specify reasons for denial in b, below.)*

(3) [ ] Partly **GRANTED** and partly **DENIED** until the court hearing. *(Specify reasons for denial in
b, below.)*

Judicial Council of California,
Revised January 1, 2012, Mandatory Form
Code of Civil Procedure, § 527.8
Approved by DOJ

**Notice of Court Hearing**
**(Workplace Violence Prevention)**

Legal Solutions Plus

WV-109, Page 1 of 3 →

exhibit F

60

# EXHIBIT G

G 1

## DECLARATION OF HERMAN J. WESSON, JR.

I, HERMAN J. WESSON, JR, state and declare as follows:

1. That I am the elected Councilmember for the Tenth District of the City Council of the City of Los Angeles ("City"), and have held my office since 2005;

2. That my work location, physical offices, and my staff are located primarily in City Hall, Room 430, 200 N. Spring Street, Los Angeles, CA 90012, and my district field office is located at 1819 S. Western Avenue, Los Angeles, CA 90006;

3. That in addition to my duties as a council member representing the residents of the Tenth District, I have also served as the President of the City Council since 2011, and as such preside over the Council meetings;

4. That in the course of Council meetings, including those conducted off site, the public is present. Members of the public may comment on the agenda items, and also have the right to make general public comment. Members of the public who wish to give public comment fill out a speaker card, which is given to the Sergeant-at-Arms and then to the City Clerk, and finally to me. City Council meetings are primarily conducted in the Council Chambers of City Hall, but also are held in Van Nuys, at the Van Nuys City Hall. Council committees also meet at City Hall and in Van Nuys;

5. That on May 11, 2016, I presided over a special meeting of the Council's Elections, Inter-Governmental Relations & Neighborhoods Committee in the Van Nuys City Hall. The meeting began at approximately 6:00 p.m. The subject of the meeting was governance reform at the Department of Water and Power;

6. That at approximately 7:30 p.m., I was handed a speaker card submitted by a member of public known to me as Wayne Spindler. Spindler attends many Council meetings and makes frequent comment. In this case the speaker card, a copy of which is attached as Attachment "A", identified the submitter as "Wayne from Encino". On the front of the card in blue ink were depictions of (1) a tree with a human figure hanging from a noose, (2) a character who was clearly depicting a Klu Klux Klan member holding a noose in one hand and a sign in the other saying "Herb=Nigger", and (3) a burning cross. On the back of the card in large block letters was written "Fuck-U Herb";

1

7.  That I was stunned at the writing and drawings on the card, and while I found the card's message threatening to me personally raising concerns for my personal safety, I allowed Spindler to provide his public comment. Shortly thereafter, I described the writing and drawings on the card to those in attendance. When I did so, Spindler began to shout out, and he refused to quiet himself causing a disruption. He was removed from the meeting by the uniformed officers present, as he was creating a disruption;

8.  That the speaker card submitted by Spindler was clearly targeted towards me as an African-American, and contained depictions of violence recalling the history of the Klu Klux Klan towards African-Americans such as myself;

9.  That I took the depictions as a personal and direct threat to me;

10. That the depictions and statements on the card had nothing to do with the DWP agenda item;

11. That based upon Wayne Spindler's written statements and depictions, his specific targeting of me, and his easy access to me as a public figure without assigned security, I am afraid for my safety, and the safety of my office staff and my family when Wayne Spindler is near;

I declare that the foregoing statements are based upon my personal knowledge and that the foregoing is true and correct under penalty of perjury under the laws of the State of California and I could and would so testify if required to do so.

Executed this 19th day of May, 2016, at Los Angeles, California.

_Herman J. Wesson, Jr._
Herman J. Wesson, Jr.

2

DECLARATION OF HERMAN J. WESSON, JR.

63

# EXHIBIT H

64

# L.A. City Hall critic faces charge of possessing an assault weapon

 By **Emily Alpert Reyes**

MARCH 29, 2017, 6:10 PM



**A**n Encino attorney who was accused last year of making racist threats against Los Angeles City Council President Herb Wesson now faces a criminal charge for illegally possessing an assault weapon, the city attorney's office said Wednesday.

Wayne Spindler, who frequently appears at City Council meetings, was arrested last year after turning in a public comment card that included drawings of a burning cross, a stick figure hanging from a tree, and a sign labeling Wesson with a racial slur.

Wesson, who is African American, described the card as a threatening reminder of the history of racist attacks on the black community. Spindler said that his drawings were satirical, arguing that images such as the hanging person symbolized the Department of Water and Power "lynching" Angelenos with high rates.

Prosecutors in the district attorney's office ultimately declined to file charges against Spindler, saying there wasn't enough evidence to prove his comment card was a threat. But city lawyers obtained a restraining order that barred Spindler from coming near Wesson's home, vehicle or city office.

That restraining order also required Spindler to surrender his firearms. Rob Wilcox, a spokesman for City Atty. Mike Feuer, said in a statement that Spindler had turned in three handguns and an AK 47 assault rifle — a weapon that is "illegal for unregistered possession in the state of California since 1991."

Spindler was charged with a misdemeanor and is scheduled to be arraigned in April, Wilcox said.

Spindler did not immediately respond to a phone call seeking comment Wednesday afternoon. He filed a federal lawsuit against the city in January alleging that his free speech and other constitutional rights had been violated, calling the arrest and restraining order "a bogus attempt as a free speech suppressant."

exhibit H                    65

Case 2:16-cv-05655-JLS-E   Document 18   Filed 04/10/17   Page 65 of 90   Page ID #:283

In that lawsuit, he also said that his "guns and all ammo were taken and destroyed by the malicious actions" of city officials.

**emily.alpert@latimes.com**

**Twitter: @LATimesEmily**

Copyright © 2017, Los Angeles Times

# EXHIBIT I

67

HOME (/INDEX.PHP)

SUPERPLANNER (/INDEX.PHP/SUPERPLANNER)

CWTV (/INDEX.PHP/CWTV)

CONTRIBUTORS (/INDEX.PHP/CONTRIBUTORS)

ARCHIVE (/INDEX.PHP/ARCHIVE)

ADVERTISE (/INDEX.PHP/ADVERTISE)

CONTACT (/INDEX.PHP/CONTACT)

# SLAPP: City Attorney's Bogus LA Times Story, 911 Call and Criminal Charge?

DANIEL GUSS  /  03 APRIL 2017



(/index.php/los-angeles/12948-slapp-city-attorney-s-bogus-la-times-story-911-call-and-criminal-charge)

PREVIOUS ARTICLE
◀  TheaterWatch: ECT's Romeo and Juliet Takes a Different Tack
(/index.php/los-angeles/12947-theaterwatch-ect-s-romeo-and-juliet-takes-a-different-tack)

NEXT ARTICLE
Rethinking the Trumpster ... The LA Times Editorial Board is Getting Edgy
(/index.php/los-angeles/12949-rethinking-the-trumpster-the-la-times-editorial-board-is-getting-edgy)  ▶

@THE GUSS REPORT-The City of Los Angeles has a history of losing anti-SLAPP (strategic **lawsuit** against public participation) lawsuits when it has illegally tried to silence critics with threats of unjust criminal charges and physical intimidation. It appears that it may be hit with another anti-SLAPP suit in the coming days for its actions last week, and it could cost the taxpayers millions of dollars in civil damages and LA City Attorney Mike Feuer a headache with the California Bar Association.

Outside a Canoga Park town hall meeting last Thursday where speakers included Feuer and California State Assemblyman Matt Dababneh, a pack of nearly 20 LAPD and California Highway Patrol officers descended upon the parking lot and allegedly drew and aimed high-powered semi-automatic guns at a man sitting in his vehicle talking calmly on his phone.

exhibit  I                           68

(Note: I was on the other end of that phone call, interviewing the man for what was supposed to be today's article and heard the encounter from its first moment.)

Law enforcement's guns were allegedly trained on Wayne Spindler, the controversial attorney embroiled in a year-long, two-way legal battle with the City of Los Angeles. He was at the meeting a half hour earlier complaining about difficulty registering guns on a state website which is not presently functional.

After ordering Spindler from his parked vehicle, law enforcement officers instructed him to lie on the pavement where he was cuffed, patted down, and had his vehicle searched while he was interrogated.

Then Spindler was let go.

*"They eventually admitted it was a false alarm,"* Spindler told me by phone after the incident, *"but they didn't apologize. This was an unprovoked threat against my life that I had better drop my civil rights lawsuits against the city ... or else."*

The story started 24 hours earlier when Feuer's primary spokesman, Mike Wilcox, planted a story (http://www.latimes.com/local/lanow/la-me-ln-weapons-charge-20170329-story.html) in the *LA Times* that reporter Emily Alpert Reyes apparently failed to confirm with the court website.

Reyes' article entitled, *LA City Hall Critic Faces Charge of Possessing an Assault Weapon,* says, "Spindler was charged with a misdemeanor and is scheduled to be arraigned in April, Wilcox said."

Note the words: *"was charged"* and *"is scheduled,"* both untrue according to the LA courts website at the time of the article's publishing. This is a snapshot (https://drive.google.com/file/d/0BwXAuqQJKBGwb2pGX2NjbzBHYWs/view) from its website taken on Sunday morning, showing no such charge in the system five days after Reyes' article was published. If the case isn't in the system, it has not been filed, a court employee confirmed for me.

Wilcox made the same claim in written form to other members of the media, which was eventually shared and wound up on the websites of *KTLA, LA Daily News, City News Service* and others who didn't check its accuracy against the court website.

I reached out multiple times to no avail to Wilcox, who has been incommunicado with me since last year when I exposed (http://www.citywatchla.com/index.php/the-la-beat/11481-la-prosecutor-fake-businesses-and-why-it-matters) Deputy City Attorney Hugo Rossitter as running two side businesses in conflict with his city employment, and for his failure to pay business taxes to the cities of Los Angeles and Beverly Hills. I also got no response from Feuer's executive assistant or his chief of staff.

I then emailed Reyes to determine whether Wilcox tipped her off on a case that was not on the court website and that the defendant knew nothing about, and what is the *Times'* policy for verifying what anyone, including a government official, claims?

Reyes refused to answer, deferring my inquiry (at the direction of her editors Shelby Grad and Steve Clow) to Hillary Manning, the *Times'* Communications Director, who repeatedly deflected.

*"We do not have a comment on this, as it relates to the details of our newsgathering,"* Manning wrote.

When advised that Reyes' story was factually wrong, Manning asked what about it was incorrect and I told her that my position, too, then, is to not disclose the details of *my* newsgathering, but that they may wish to confirm its accuracy, which was also suggested to Reyes.

Neither the *Times* nor Reyes apparently did that though. Her article remains published in its original form on the *Times'* website in direct conflict with the LA court website, five days after it was published.

This turmoil all started nearly a year ago when Spindler submitted an LA City Council speaker card with racially antagonistic words and imagery to City Council president Herb Wesson, who is black, and who felt Spindler's content was threatening. While the city obtained a temporary restraining order (TRO) against Spindler, which he is appealing, the California Bar Association refused to take action against him, citing his content as free speech and that it did not constitute a threat.

The TRO against Spindler required him to turn in all firearms he owned, which he did in May 2016. His AK-47 was unregistered but, he says, it was grandfathered because it was purchased prior to the 1991 law requiring registration. *"As an officer of the court, even though the gun was legally not in the state's registry, I turned it in for voluntary destruction along with my other guns because that is what I was ordered to do."*

Spindler provided me with a dated copy of the receipt (https://drive.google.com/file/d/0BwXAuqQJKBGwdkdlOVpVWEJDOGc/view) for the gun's purchase which, he says, was provided to the LAPD when he turned it in. The date of purchase was January 25, 1989, long before the 1991 law. (I cropped the receipt to not expose Spindler's personal information on it.)

That raises the question, *if possession of the gun is a misdemeanor, as Feuer now claims, why was Spindler not arrested on the spot and charged with a crime when he turned it in in May 2016?*

What has transpired between then and now, since the possession was not illegal?

The answer is Spindler's civil lawsuits against the city, and his appeal of the TRO, that's what.

And why *would anyone* be charged with a misdemeanor when the state recently launched a program allowing people to register guns without repercussions for not doing so earlier?

In our phone interview right before the LAPD and CHP surrounded his vehicle with guns drawn, Spindler told me, *"If they're going to try to prosecute me for that, which I am confident I will win, they had better be prepared to charge everyone else in LA in the same predicament."*

At a recent settlement meeting with attorneys representing the city, Spindler says they encouraged him to hold off serving the city with his second civil suit (against Wesson,) allegedly and ominously telling him they *"would see what we can do about this."*

Spindler claims that Feuer's office planted the fake *LA Times* story on Wednesday and 'threatened his life' on Thursday to induce a *quid pro quo* to drop his civil lawsuits and his TRO appeal in exchange for their dropping what he says is a baseless misdemeanor charge.

He adds that Feuer violated the State Bar's Ethics Rule 5-100, which states that a prosecutor can't threaten criminal charges in order to get an advantage in a civil lawsuit; Rule 5-110, that they can't threaten charges that don't stand up to probable cause standards; and 5-120, that Wilcox's *extrajudicial* statements to the media were done to bias a potential jury pool.

Spindler says he will sue to get the recorded 911 call, if one was actually made, and phone records of everyone who accompanied Feuer and Dababneh to the town hall to establish what threat they claim he posed, and whether, if they felt he *did* pose a threat, the meeting hall doors were locked and the building evacuated from the other side.

That is what you would do ... *if* you feel someone posed a threat requiring such a heavy-handed law enforcement response.

*(Daniel Guss, MBA, is a member of the Los Angeles Press Club, and has contributed to CityWatch, KFI AM-640, Huffington Post, Los Angeles Times, Los Angeles Daily News, Los Angeles Magazine, Movieline Magazine, Emmy Magazine, Los Angeles Business Journal and elsewhere. Follow him on Twitter @TheGussReport. His opinions are his own and do not necessarily reflect the views of CityWatch.) Edited for CityWatch by Linda Abrams.*

# EXHIBIT J

71



# OFFICE OF THE CITY ATTORNEY
### MICHAEL N. FEUER
### CITY ATTORNEY

March 29, 2017

WAYNE SPINDLER
PO BX 16501
ENCINO, CA 91416-6501

Case Number: 7VW01632

Dear WAYNE SPINDLER:

Please be advised that a criminal complaint has been filed charging you with a violation of Section P30605a, commonly known as possession of assault weapon. There may be other charges included in the complaint, which are not listed here. If you are on probation in any other case, a probation violation also may have been filed.

You are notified to appear for arraignment in Department 101 of the Superior Court of California, County of Los Angeles, located at 14400 Erwin Street Mall, Van Nuys, CA 91401-2705 at 8:30 a.m. on April 21, 2017.

Failure to appear at the date and the time indicated may result in the issuance of a warrant for your arrest.

Please bring this letter with you to court.

Sincerely,

Richard A. Schmidt
Supervising Attorney
Van Nuys Criminal Branch

AN EQUAL EMPLOYMENT OPPORTUNITY - AFFIRMATIVE ACTION EMPLOYER
6262 Van Nuys Blvd., Room 151 o Van Nuys, CA 91401 o (818)374-3300 TDD o FAX:(818)374-3310

exhiBA J                                                                        72

# EXHIBIT K

73

1  Paul Hoffman, SBN 071244
   SCHONBRUN SEPLOW
2  HARRIS & HOFFMAN LLP
   200 Pier Avenue #226
3  Hermosa Beach, California 90254
   Telephone: (310) 396-0731
4  Fax: (310) 399-7040

5  Catherine Sweetser, SBN 271142
   SCHONBRUN SEPLOW
6  HARRIS & HOFFMAN LLP
   11543 West Olympic Blvd.
7  Los Angeles, California 90064
   Telephone: (310) 396-0731
8  Fax: (310) 399-7040

9  Attorneys for Plaintiff
   Marina Borawick

10

11

12              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
13

14  Marina Borawick, an individual        )   Case No.
                                          )
15              Plaintiff                 )
                                          )   **COMPLAINT FOR DAMAGES**
16        v.                              )
                                          )   1. **Violation of Fourth and**
17  CITY OF LOS ANGELES, a public         )      **Fourteenth Amendments, 42**
    entity, OFFICER CORREA, and DOES      )      **U.S.C. § 1983**
18  1-10,                                 )   2. **Violation of the First**
                                          )      **Amendment**
19              Defendants.               )   3. **Violation of Americans With**
                                          )      **Disabilities Act**
20  _____  )   4. **Violation of Civil Rights Under**
                                          )      **Civil Code §52.1**
21                                        )   5. **Assault**
                                          )   6. **Battery**
22                                        )   7. **Negligence**
                                              8. **Negligent Hiring/Employment**
23

24

25                                            **DEMAND FOR JURY TRIAL**

26

27

28

                              1

exhibit *    74

Marina Borawick ("Plaintiff" or "Ms. Borawick") hereby makes the following allegations in support of this complaint:

## INTRODUCTION

1.      This case is about excessive force used against Ms. Borawick by LAPD officers when she was arrested following a stop for a broken taillight. Ms. Borawick at the time was suffering from a frozen shoulder and had several previous arterial bypasses. She explained her physical condition to the officers before they touched her. Nonetheless, the officers failed to accommodate her medical conditions, handcuffed her behind her back and caused her extreme pain as well as a blockage of her axillary-axillary bypass (located across her upper chest) due to the stretching and bending of the bypass. As a result of Defendants' actions Plaintiff suffered  physical injuries and severe emotional distress. Plaintiff continues to suffer injuries directly attributable to Defendants' unconstitutional and unlawful actions.   This case seeks to hold the LAPD officers and the City of Los Angeles accountable for their unconstitutional and wrongful actions.

## JURISDICTION AND VENUE

2.      This case arises under 42 U.S.C. § 1983. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.   This Court has subject matter jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b) and (e) in that (1) the unlawful actions challenged herein occurred in the Central District; and (2) all of the parties reside in the Central District.

## PARTIES

4.      Plaintiff Marina Borawick brings this action individually. Ms. Borawick was a resident of the City of Los Angeles at all times during the events

2

75

1    alleged in this complaint.    Ms. Borawick is a successful lawyer who has resided
2    in Los Angeles for many years.

3        5.    Defendant City of Los Angeles ("City") is a municipality duly
4    organized under the laws of the State of California.  At all relevant times, the Los
5    Angeles Police Department ("LAPD") was a branch or agency of City.  The LAPD
6    officers involved in unlawful acts alleged herein were all LAPD officers acting
7    within the course and scope of their duties. The City is responsible for Plaintiff's
8    injuries under 42 U.S.C. § 1983 because its policies and customs caused Plaintiff's
9    injuries.   The City is also responsible for the actions of its employees for
10   violations of California law under Government Code § 815.1 based on  respondeat
11   superior.

12       6.    Officer CORREA is an LAPD officer working out of the Pacific
13   Division.  He is one of the officers who was present at the time of the traffic stop
14   and whom Ms. Borawick informed about her medical conditions.  At all times
15   herein mentioned, Defendant CORREA was an employee of the Los Angeles
16   Police Department and the City of Los Angeles, and was at all times relevant to
17   this action acting in the course and scope of his employment.

18       7.    Plaintiff is informed and believes and thereon alleges that, at all
19   relevant times, Defendants  DOES 1-10 were employees or officials of City, a
20   municipality of the State of California and were California police officers. Plaintiff
21   is ignorant of the true identities and capacities of Defendants DOES 1-10 and for
22   that reason sues those defendants by such fictitious names.  Plaintiff is informed
23   and believes and thereon alleges that each of the fictitiously named Defendants is
24   in some manner and to some extent liable for the injuries alleged in this
25   Complaint.  Plaintiff will seek leave to amend this Complaint to allege the true
26   identities and capacities of these fictitiously named Defendants when they are
27   ascertained.

28

76

1      8.    Plaintiff is informed and believes and thereon alleges that each
2  Defendant is, and at all times mentioned was, the agent, employee, representative,
3  successor and/or assignee of each other Defendant.  Each Defendant, in doing the
4  acts, or omissions as alleged in this Complaint, was acting within the scope of his
5  or her actual or apparent authority or the alleged acts and omissions of each
6  defendant as agent subsequently were ratified and adopted by each other defendant
7  as principal.  The defendant officers, including those involved in the obstruction
8  of justice, were engaged in a conspiracy to violate Plaintiff's constitutional rights
9  and were acting as co-conspirators with this aim in mind.

10      9.    All Defendants, at all times relevant to the allegations herein, acted
11  under the color of state law and are sued in both their individual and official
12  capacities.

13      10.    In committing the acts alleged in this complaint, the individual
14  Defendants acted knowingly, maliciously  and with reckless or callous disregard
15  for Ms. Borawick's constitutional and other rights justifying an award of punitive
16  damages under federal and California law against each individual Defendant.

17

18                    **STATEMENT OF FACTS**

19    11.    At approximately 7:30 PM on April 21, 2016, Plaintiff Marina
20  Borawick was driving west on either Washington or Venice Boulevard on her way
21  to obtain treatment for a medical condition when an officer pulled her over.  The
22  officer informed her that she had been stopped because one of her taillights was
23  out.

24    12.   In April 2016 Ms. Borawick suffered from an extremely painful
25  condition called frozen shoulder.  Ms. Borawick immediately informed the officer
26  that she was on the way to a medical appointment to obtain medical treatment for
27  her shoulder and that the clinic would not treat her if she was too late for the
28  appointment.  She asked him if he would let her continue on her way as she had
already made arrangements to fix the taillight the next day.

77

1       13. The officer refused to let Ms. Borawick leave and asked her if she had

2  been drinking. She told him she was drinking water. The officer then told her that

3  she had an attitude problem and was under arrest.

4       14. The officer ordered Ms. Borawick out of her car. Ms. Borawick asked

5  what she was going to be arrested for and the officer said that she was being

6  arrested for a hit and run. Ms. Borawick told the officer that it was a mistake and

7  that she had never committed a hit and run. She explained that she was an

8  attorney and a member in good standing of the bar for over 30 years with no

9  criminal record. She asked if he could set a court date for the warrant and let her

10  go.

11      15. At that point, another LAPD vehicle pulled up behind Ms. Borawick.

12  Four officers surrounded her. Ms. Borawick informed all of the officers present

13  that her shoulder could not be moved because she suffered from a painful medical

14  condition called "frozen shoulder" and had severely restricted mobility. She asked

15  them to look up the condition. She also told the officers that she had had three

16  bypasses. Ms. Borawick explained that the officers could not cuff her arms behind

17  her back because of these disabilities. She told them that they could call her

18  doctor if they wanted to.

19      16. There was no reason to handcuff Ms. Borawick at all. Ms. Borawick

20  was conversing rationally with the officers and posed no apparent threat to them.

21  She was a fifty-nine year old disabled and unarmed woman surrounded by four

22  male officers.

23      17. The officers did not attempt to pat down or search Ms. Borawick.

24  Their failure to check if Ms. Borawick had any weapons indicates that they did not

25  actually expect Ms. Borawick to act violently or aggressively. There was no

26  reason to handcuff Ms. Borawick behind her back in direct contradiction of the

27  medical information she was giving them.

28

18. Ms. Borawick began screaming from the pain as soon as the officers jerked her arms behind her back. Despite her screaming, crying, and praying, the officers continued with the handcuffing and left her handcuffed behind her back for an extended period of time.

19. Ms. Borawick was in fear of her life. She knew that her bypass could not be bent and that life-threatening clots could be caused by the position she was being held in. She also knew it was a possibility that the failure of the bypass could deprive her of blood to her brain or cause a stroke. Her vision immediately narrowed and became tunnel-like so that she could only see at small single point ahead of her. When she was placed in the car, she honestly thought she was going to die.

20. The pain from her frozen shoulder was searing. It was so severe that she felt she could not breathe. She thought she might faint. She told the officers again and again that the disability was making this position unbearable, but the officers ignored her complaints.

21. The officers took her wallet out of her purse and locked her purse and phone in the trunk of her car.

22. The officers then took her to jail at the Pacific Division. She was handcuffed for roughly thirty minutes. Ms. Borawick was in torturous pain and fear for her life for that entire period of time. The officers told Ms. Borawick she would have to spend the night at the Pacific Division.

23. Ms. Borawick's doctor has told her to drink water constantly for her autoimmune disorder, which is called Sjogren's Syndrome. When one opens Ms. Borawick's wallet, the first thing one sees is a "MEDICAL INFO" page in the front of her wallet that details the autoimmune disorder she suffers from and the fact that she has had multiple bypasses. Although the officers at the Pacific Division took and examined her wallet, they did not immediately remove her handcuffs and they did not give her sufficient water while she was being held in Pacific Division. Ms. Borawick was given only a small Dixie cup of water.

79

24. The officers then decided she would be taken to the Santa Monica Police Department as the warrant issued from there.

25. To transfer Ms. Borawick to Santa Monica, the officers *again* handcuffed her behind her back. When they entered the cell to handcuff her, Ms. Borawick asked them "Why are you handcuffing me again? There's no need!" They said they would put on one extension ring to make it less painful for her. She asked if she could have two or three extension rings at least, but the officers refused to add more rings.

26. The twisting of her shoulder behind her back was still extremely painful. There was again no reason to handcuff Ms. Borawick behind her back or indeed to handcuff Ms. Borawick at all. Ms. Borawick had at all times acted cooperatively with the officers. Ms. Borawick was handcuffed for another thirty minutes while being transported to Santa Monica.

27. While in the car on the way to Santa Monica, one of the officers remarked to Ms. Borawick that he had looked up the "frozen shoulder" on the internet and that he thought it was good for her to stretch her shoulder.

28. At Santa Monica, Ms. Borawick was released from the handcuffs once the LAPD officers placed her inside a cell. The Santa Monica Police Department officers did not attempt to handcuff her when removing her from that cell and bringing her to a booking officer. Instead, the booking officer gave her a court date and told her she was free to leave.

29. As the LAPD had towed Ms. Borawick's car, it was difficult for her to get home.

30. All of the Defendants had the ability to prevent other officers from committing unconstitutional and unlawful acts causing injury to Plaintiff and failed or refused to do so.

31. After the incident, Ms. Borawick suffered from amarosis, or narrowing of vision, in her right eye and a loss of blood pressure in her right arm, indicating

7

1   that her arterial bypass was no longer working properly.  To date, Ms. Borawick

2   has had one surgery related to the incident in order to clean out the clots that

3   formed in her axillary-axillary bypass.  That surgery did not successfully repair the

4   problems with the bypass.  She has also experienced a reversed bloodflow in her

5   carotid bypass since the incident.  At this point, Ms. Borawick is taking blood

6   thinners and waiting to see if she needs to undergo an even more invasive surgery

7   to put in a new bypass.

8        32.  Ms. Borawick also suffered emotional distress from the fear she was in

9   during the encounter that she would die or be deprived of blood to her brain, from

10  the torturous pain she endured, from the subsequent medical problems and the

11  surgeries and proceduresshe has had to undergo, and from the uncertainty of

12  knowing whether her health will worsen.

13       33.  Ms. Borawick filed a tort claim with the City of Los Angeles on August

14  22, 2016.  Her claim was denied on September 15, 2016.

15                          **MONELL ALLEGATIONS**

16       34.    Based upon the principles set forth in *Monell v. New York City

17  Department of Social Services*, 436 U.S. 658 (1978), Defendant City is liable for

18  all injuries sustained by Plaintiff as set forth herein. Defendant City bears liability

19  because its policies, practices and/or customs caused Plaintiff's injuries. The

20  conduct alleged above resulted from the following policies, customs, or practices

21  of the Los Angeles Police Department:

22       A. The Department had a custom, policy, or practice of handcuffing

23       arrestees behind their back, whether or not the arrestee posed any threat to

24       the officers.

25       B. The Department had a custom, policy, or practice of failing to train their

26       officers that those who could not rotate their arms behind their back should

27       be accommodated by handcuffing them another way.  The Department was

28       previously sued for failing to accommodate people who were unable to raise

         their arms or rotate their arms behind their back in 2010 in the case *Harris*

                                      8

1    *v. Los Angeles Police Department*, No. BC451880, but failed to alter its

2    training or policies.

3    C. The Department had a policy, custom, or practice of failing to provide

4    adequate training and supervision to officers with respect to constitutional

5    limits on use of force, detention, and provision of medical care;

6    D. The Department failed to adequately discipline or retrain officers

7    involved in misconduct;

8    E. The Department condoned and encouraged officers in the belief that they

9    can violate the rights of persons such as Plaintiff with impunity, and that

10   such conduct will not adversely affect officers' opportunities for promotion

11   and other employment benefits.

12   35.  The Los Angeles Police Department failed to adequately train Officer

13   Correa and Does 1-10 in assessing whether a person should be handcuffed at all as

14   well as in assessing whether to handcuff a person in front of or behind their back.

15   36.  The Los Angeles Police Department also failed to adequately train

16   Officer Correa and Does 1-10 that they should alter the method of handcuffing or

17   remove the handcuffs if a person complained that the handcuffs were causing them

18   great pain.

19   37. The Los Angeles Police Department failed to adequately train Officer

20   Correa and Does 1-10 that they should include in their assessment of the situation

21   statements by the person concerning medical conditions they suffered from.

22   **FIRST CLAIM FOR RELIEF**

23   **VIOLATION OF 42 U.S.C. § 1983 FOR VIOLATIONS OF THE FOURTH AND FOURTEENTH AMENDMENTS**

24   **OF THE UNITED STATES CONSTITUTION**

25   **(EXCESSIVE FORCE)**
     **(AGAINST ALL DEFENDANTS)**

     38.    Plaintiff hereby incorporates by reference paragraphs 1 through 24

26   herein, as if set forth in full.

27   39.    Defendants' actions  deprived Plaintiff of her rights under the Fourth

28

9

82

1  and Fourteenth Amendments to the United States Constitution.  Plaintiff brings

2  her claims for damages for the violation of these rights  based on 42 U.S.C. §

3  1983.

4      40.  Defendants violated Plaintiff's rights under the Fourth and Fourteenth

5  Amendments, inter alia, by subjecting her to excessive force by handcuffing her

6  without justification and in a way which they knew would cause her extreme pain.

7  Defendants had absolutely no justification to use any force against Ms. Borawick.

8  Defendants were informed that the handcuffing would cause her extreme pain and

9  and that she had had three bypasses and proceeded nonetheless to handcuff her

10  behind her back.

11      41.  The handcuffing was unnecessary.  Defendants could have released

12  Ms. Borawick on the scene with a court date.  Defendants could have taken Ms.

13  Borawick in without handcuffs, as Ms. Borawick posed no physical threat and was

14  cooperative at all times.

15      42.  As a direct and legal result of the acts and omissions of Defendants,

16  Ms. Borawick has suffered great bodily injury, fear, anxiety, torment, and

17  emotional distress.

18      43.  Defendants' acts were willful, malicious, intentional, oppressive,

19  reckless and/or were done in willful and conscious disregard of the rights, welfare

20  and safety of Plaintiffs, thereby justifying the awarding of punitive and exemplary

21  damages in an amount to be determined at time of trial.

22

23                          **SECOND CLAIM FOR RELIEF**

24  **VIOLATION OF 42 U.S.C. § 1983 FOR VIOLATIONS OF THE FIRST AND FOURTEENTH AMENDMENTS**

25              **OF THE UNITED STATES CONSTITUTION**

                        **(RETALIATION)**

26                  **(AGAINST ALL DEFENDANTS)**

    44.  Plaintiff hereby incorporates by reference paragraphs 1 through 43

27  herein, as if set forth in full.

28      45.  Defendants' actions  deprived plaintiffs of his rights under the First

and Fourteenth Amendments to the United States Constitution.  Plaintiff brings his

83

1    claims for damages for the violation of these rights  based on 42 U.S.C. § 1983.

2         46.    Defendants acted maliciously in detaining and handcuffing Ms.

3    Borawick in retaliation for the statements she made to the officer.  Defendants

4    handcuffed her because they judged her to have an "attitude problem".

5         47.    As a direct and legal result of the acts and omissions of Defendants,

6    Ms. Borawick has suffered fear, anxiety, torment, and emotional distress, and

7    severe physical injuries.  She has been forced to undergo three surgeries.  Her pain

8    and suffering on the night in question were extreme.

9         48.    Defendants' acts were willful, malicious, intentional, oppressive,

10   reckless and/or were done in willful and conscious disregard of the rights, welfare

11   and safety of Plaintiffs, thereby justifying the awarding of punitive and exemplary

12   damages in an amount to be determined at time of trial.

13

14                          **THIRD CLAIM FOR RELIEF**

15              **DISCRMINATION ON THE BASIS OF DISABILITY**
          **IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
16                     **(AGAINST ALL DEFENDANTS)**

17        49.   Plaintiff hereby incorporates by reference paragraphs 1 through 48
     herein, as if set forth in full.

18        50.    Plaintiff suffers from a "disability" within the meaning and scope of

19   42 U.S.C. § 12102.  In particular, Ms. Borawick's disability makes it difficult for

20   her to bend and for her body to operate its circulatory functions.  Accordingly, Ms.

21   Borawick  is a member of the class of persons protected by 42 U.S.C. § 12132,

22   which makes it an unlawful for a public entity to discriminate against an

23   individual with a disability or to deny the benefits of the services, programs or

24   activities of a public entity to a person with a disability.

25        51.    As alleged herein, defendant discriminated against by, among other

26   things its failure to provide  reasonable accommodations for Plaintiff's disability.

27        52.    By the aforesaid acts and omissions of Defendant, Plaintiff has been

28

84

1  directly and legally caused to suffer actual damages including, but not limited to,

2  medical expenses, attorneys' fees, costs of suit and other pecuniary loss not

3  presently ascertained.

4      53.   As a further direct and legal result of the acts and conduct of

5  Defendant, as aforesaid, Plaintiff has been caused to and did suffer and continues

6  to suffer severe physical injuries, sickness and emotional and mental distress,

7  anguish, humiliation, embarrassment, fright, shock, pain, discomfort and anxiety.

8  The exact nature and extent of said injuries is presently unknown to plaintiff.

9      54.   As a result of Defendants' conduct as alleged herein, Plaintiff is

10  entitled to reasonable attorneys' fees.

11
12              **FOURTH CLAIM FOR RELIEF**
            **(BANE ACT, CAL. CIVIL CODE §52.1)**
                **(AGAINST ALL DEFENDANTS)**

13      55.   Plaintiff hereby incorporates by reference paragraphs 1 through 53

14  herein, as if set forth in full.

15      56.   The acts by Defendants violate the federal and state constitutional

16  rights of Plaintiff, as guaranteed by the Fourth and Fourteenth Amendments to the

17  U.S. Constitution and by the California Constitution Article I, sections 1, 2, 7, and

18  13.  Defendants used force, intimidation, coercion, and/or the threat of force,

19  intimidation, and coercion directed toward retaliating against Plaintiff for her

20  purported "attitude problem" in speaking to the officers.  Defendants deprived

21  Plaintiff of her right to be free from the use of excessive force in seizing her.

22      57.   Defendants' unlawful actions were done willfully, maliciously, and

23  with the specific intent to deprive Plaintiff of her constitutional and statutory

24  rights.

25      58.  As a direct and proximate consequence of Defendants' actions, Plaintiff

26  suffered a loss of her constitutional rights, physical injury and pain and suffering,

27  and she is entitled to compensatory damages for the injury to her person and, as to

28  the individual Defendants, all damages authorized by Civil Code §52.1, including

punitive damages and attorney's fees as permitted by law.

85

## FIFTH CLAIM FOR RELIEF
### (ASSAULT)
### (AGAINST ALL DEFENDANTS)

59.   Plaintiff hereby incorporates by reference paragraphs 1 through 57 herein, as if set forth in full.

60.   In doing the acts described herein, Defendants intended to place Ms. Borawick in apprehension of an imminent offensive contact with her person.  As a result of Defendants' and each of their, intentional acts, Ms. Borawick was in fact placed in great apprehension of imminent harmful and offensive contact with her person.

61.   Defendants' conduct, as described above, caused Ms. Borawick to be apprehensive that Defendants would subject her to intentional invasions of her right to be free from offensive and harmful contact and demonstrated that at all times material herein, Defendants had a present ability to subject Ms. Borawick to an intentional offensive and harmful touching.

62.   Defendants' conduct was malicious and oppressive, and done with a conscious disregard of Ms. Borawick's rights.   Defendants had absolutely no justification to use any force against Ms. Borawick.  Defendants were informed that the handcuffing would cause her extreme pain and proceeded nonetheless to handcuff her behind her back.

63.   As a direct and proximate consequence of Defendants' actions, Plaintiff suffered physical injury and pain and suffering, and she is entitled to compensatory damages for the injury to her person.  She also suffered anxiety, worry, mental anguish, and emotional distress.  Defendants are responsible for all damages suffered by Ms. Borawick, including compensatory and punitive damages.

## SIXTH CLAIM FOR RELIEF

86

**(BATTERY)**
**(AGAINST ALL DEFENDANTS)**

64. Plaintiff hereby incorporates by reference paragraphs 1 through 57 herein, as if set forth in full.

65. In doing the acts described herein, Defendants intended to place Ms. Borawick in apprehension of an imminent offensive contact with her person and did in fact come into contact with Ms. Borawick's person without her consent when Defendants intentionally handcuffed Ms. Borawick in such a way as to cause her great pain. As a result of Defendants' and each of their, intentional acts, Ms. Borawick was hurt physically and was placed in fear of her life.

66. Defendants twisted Ms. Borawick's hands behind her back and left her handcuffed for approximately thirty minutes. There was no justification for handcuffing Ms. Borawick. Defendants then re-handcuffed Ms. Borawick for transport, again behind her back, without any justification whatsoever.

67. Defendants' conduct was malicious and oppressive, and done with a conscious disregard of Ms. Borawick's rights.

68. As a direct and proximate consequence of Defendants' actions, Plaintiff suffered physical injury and pain and suffering, and she is entitled to compensatory damages for the injury to her person. She also suffered anxiety, worry, mental anguish, and emotional distress. Defendants are responsible for all damages suffered by Ms. Borawick, including compensatory and punitive damages.

**SEVENTH CLAIM FOR RELIEF**
**(NEGLIGENCE)**
**(AGAINST ALL DEFENDANTS)**

69. Plaintiff hereby incorporates by reference paragraphs 1 through 67 herein, as if set forth in full.

70. Defendants were informed that Ms. Borawick had a disability that would make handcuffing her very painful for her. Nonetheless, Defendants disregarded her statements and proceeded to handcuff her behind her back.

71. Ms. Borawick was entitled to a duty of care from the officers who

14

arrested her.  The officers had a duty not to use excessive force against her and to reasonably accommodate her disability.  The officers chose to detain Ms. Borawick and had a duty of care to those they detained.

72.  In doing the acts described herein, Defendants breached their duty of care to Ms. Borawick.  Defendants negligently subjected Ms. Borawick to injury, harm and damage when they chose to handcuff her behind her back for an extended period of time without any justification.

73.  As a direct and proximate consequence of Defendants' actions, Plaintiff suffered physical injury and pain and suffering, and she is entitled to compensatory damages for the injury to her person.  She also suffered anxiety, worry, mental anguish, and emotional distress.  Defendants are responsible for all damages suffered by Ms. Borawick, including compensatory and punitive damages.

## EIGHTH CLAIM FOR RELIEF
### (NEGLIGENT EMPLOYMENT AND SUPERVISION)
### (AGAINST DEFENDANT CITY OF LOS ANGELES)

74.  Plaintiff hereby incorporates by reference paragraphs 1 through 67 herein, as if set forth in full.

75. In April 2016, Defendant CITY OF LOS ANGELES, by and through its employees in the Los Angeles Police Department, as supervisors of the individually named Defendants herein, knew or in the exercise of due care should have known, that the individually named Defendants had not been trained properly in accommodating detainees with limited mobility and disabling medical conditions.  Moreover, Defendant CITY OF LOS ANGELES knew or should have known that its officers had a custom, practice, or policy of failing to accommodate detainees who could not raise their arms or put them behind their back.  Moreover, Defendant CITY OF LOS ANGELES knew or should have known that its officers had a custom, practice, or policy of retaliating against citizens they perceived to have an "attitude problem" and failed to discipline officers who so acted or to

88

1    correct this custom, practice, or policy.

2        76. On or about April 21, 2016, Ms. Borawick was entitled to a duty of care

3    by the City of Los Angeles when she was stopped by defendant officers.

4        77. In failing to train and supervise its officers, Defendant CITY OF LOS

5    ANGELES breached its duty of care to Ms. Borawick and other detainees of the

6    Los Angeles Police Department. Its failure to train its officers in the appropriate

7    procedures and to discipline officers who acted to retaliate against those perceived

8    to have the "wrong attitude" subjected Ms. Borawick to injury, harm and damage

9    when the Los Angeles Police Department officers ignored her statements that her

10   arms could not be put behind her back and chose to handcuff her behind her back

11   for an extended period of time without any justification.

12       78. As a direct and proximate consequence of Defendant's actions, Plaintiff

13   suffered physical injury and pain and suffering, and she is entitled to

14   compensatory damages for the injury to her person. She also suffered anxiety,

15   worry, mental anguish, and emotional distress. Defendant City of Los Angeles is

16   responsible for all damages suffered by Ms. Borawick, including compensatory

17   and punitive damages.

18

19                          **PRAYER FOR RELIEF**

20       **WHEREFORE**, Plaintiff respectfully requests relief as follows:

21       79.  The award of general and compensatory damages against all

22   Defendants, jointly and severally, in an amount according to proof at trial;

23       80.  The award of punitive and exemplary damages against all Defendants

24   sued in their individual capacities in an amount to be proven at trial;

25       81.  The award of any and all other damages allowed by law according to

26   proof to be determined at time of trial in this matter;

27       82.  The award of costs of suit and reasonable attorneys' fees pursuant to

28   42 U.S. §1988, California Code of Civil Procedure §1021.5, and California Civil

     Code §52.1.

89

83.   The award of such other relief as the court deems just and proper.


Dated: March 14, 2017          SCHONBRUN SEPLOW
                               HARRIS & HOFFMAN, LLP

                               By: _____

                                   Paul Hoffman
                                   Catherine Sweetser

                                   Attorneys for Plaintiff

90

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### DEMAND FOR JURY TRIAL

Plaintiff hereby respectfully demands that a trial by jury be conducted with respect to all issues presented herein.

Dated: March 14, 2017

SCHONBRUN SEPLOW
HARRIS & HOFFMAN, LLP

By:

Paul Hoffman
Catherine Sweetser

Attorneys for Plaintiff

91